EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN ANTONIO FOURNIER SAMPEDRO, acusado y apelante.

Número 16079.

*Reasignado:* 14 de febrero de 1958. *Resuelto:* 14 de junio de 1958.

*Juan B. Soto,* abogado del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo (José Trías Monge, ex Secretario de Justicia,* en el alegato), *Arturo Estrella, Secretario de Justicia Auxiliar* y *Ramón C. Ruiz Sánchez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del Tribunal.

Ramón Antonio Fournier Sampedro fue acusado de asesinato en primer grado. Se le imputó que "en forma ilegal, voluntaria y criminalmente, con malicia premeditada, deliberación e intención y propósito decidido y firme de matar, demostrando tener un corazón pervertido y maligno, dió muerte ilegal al ser humano Iris Nereida Hernández Matos, su ex esposa, estrangulándola; habiendo enterrado clandestinamente el cadáver de la mencionada Iris Nereida Hernández Matos en el Cementerio Fournier de Isla Verde." Véanse los arts. 199, 200 y 201 del Código Penal de Puerto Rico (ed. 1937), 33 L.P.R.A. secs. 631, 632 y 633. En *Pueblo* v. *Fournier,* 77 D.P.R. 222 (1954) revocamos una sentencia de reclusión perpetua impuesta al acusado luego de haber sido éste juzgado y declarado culpable por un jurado del referido delito. Ordenamos un nuevo juicio al determinar (1) que la primera confesión escrita del acusado admitida en evidencia había sido obtenida mediante coacción sicológica, y (2) que el jurado no fué instruído correctamente sobre las pautas que debía seguir para determinar la voluntariedad de una segunda confesión oral que también fue admitida en evidencia y considerada por el jurado.

El segundo juicio se celebró a principios de 1955. Nuevamente un jurado encontró culpable al acusado del delito de asesinato en primer grado que se le imputaba. Se presentó una moción solicitando nuevo juicio a tenor con el art. 303 del Código de Enjuiciamiento Criminal (ed. 1935), 34 L.P.R.A. sec. 883. El Tribunal Superior declaró sin lugar esa moción y dictó sentencia condenando a Fournier a la pena de reclusión perpetua.(¹) El acusado apeló de la sentencia dictada así como de la resolución denegando nuevo juicio, y señala en este recurso catorce errores. La vista del caso ante nos se celebró el 13 de noviembre de 1956 y poco tiempo después el recurso quedó sometido a la consideración de este Tribunal. Hemos considerado cuidadosamente todos los señalamientos de error y creemos que ninguno de ellos tiene méritos.

· Iris Nereida Hernández Matos y el acusado contrajeron matrimonio a principios de 1947. En agosto de 1948 nació una niña de ese matrimonio, pero a fines de 1949 Iris Nereida se divorció del acusado por la causal de trato cruel e injurias graves. La custodia de la hija le fue concedida a Iris Nereida y Fournier venía obligado a pasarle $150 mensuales para sus alimentos. El día 7 de septiembre de 1950 Iris Nereida salió por la mañana de la casa de sus padres, donde vivía con su hija, y se dirigió a su trabajo. Para esa fecha ella era secretaria de un doctor en Santurce. Antes de casarse Iris Nereida había estudiado para enfermera en la Clínica Díaz García. Estaba vestida con un traje de falda ancha, unos zapatos blancos de taco alto, un cinturón de color plateado y un pañuelo en la cabeza de muchos colores. Llevaba una cartera blanca, una pulsera

---

(¹) El artículo 202 del Código Penal (33 L.P.R.A. sec. 634) dispone que toda persona culpable de asesinato en primer grado será castigada con reclusión perpetua en el presidio. En 1917 se abolió provisionalmente en Puerto Rico la pena de muerte. Véase la Ley núm. 36 de 30 de noviembre de 1917 (Leyes, pág. 325). La Ley núm. 42 de 26 de abril de 1929 (Leyes, pág. 233) abolió permanentemente la pena de muerte en Puerto Rico. Véanse 33 L.P.R.A. sec. 634 y 34 L.P.R.A. sec. 993.

de oro en la muñeca, una sortija y una caja de Kleenex, porque tenía catarro. Además llevaba como ropa interior: enaguas, panties y un brassiere. Desapareció en la tarde de ese mismo día. Su cadáver fué encontrado el día 8 de octubre de 1950 enterrado en la arena bajo el piso de cemento de la fosa número 4 del Cementerio Fournier, del cual era administrador y condueño el acusado. Estaba boca abajo con las piernas y los brazos doblados hacia la espalda. Aparecía completamente vestida, con un traje, enaguas, brassiere y panties, pero le faltaba un zapato. En el brazo izquierdo tenía una pulsera de oro y en una mano una sortija de diamantes. La falda del traje cubría su cabeza y entre el traje y la cara se encontró su cartera y una caja de Kleenex. Un pañuelo de colores amarrado con un nudo cubría la nariz y la boca. Alrededor del cuello aparecía un cinturón plateado, de mujer, atado en forma de torniquete.(²) El cinturón daba dos vueltas alrededor del cuello y un poco a la derecha tenía un nudo, y en el nudo había un clavo de 4 ½ pulgadas. El clavo estaba un poco torcido en el nudo del cinturón. La muerte había ocurrido aproximadamente cuatro o seis semanas antes. El cinturón estaba atado inmediatamente debajo de la laringe y se notaba una depresión bastante profunda en el cuello. La laringe mostraba dos fracturas y las paredes de la tráquea estaban comprimidas por la presión del cinturón.

Según declaró el patólogo Dr. Babbs, que hizo la autopsia, las lesiones de la laringe y de la tráquea fueron causadas por la presión del cinturón, la presión de una mano o un golpe. La causa de la muerte fue asfixia por estrangulación mediante garrote. Dicho testigo declaró que, dada la manera en que estaba puesto el cinturón con el clavo en

---

(²) La defensa admitió que el traje, el pañuelo de colores, los panties, el brassiere, las enaguas, el cinturón, la cartera, la pulsera y la caja de Kleenex (Exhibits 19, 20, 21, 22, 23, 24, 25, 26 y 27 de El Pueblo) que se encontraron sobre el cadáver, eran las mismas prendas de vestir que llevaba Iris Nereida al salir de su casa el día 7 de septiembre de 1950 por la mañana.

el nudo y dos vueltas alrededor del cuello, Iris Nereida no pudo haberlo colocado allí. El diámetro de las dos vueltas era menor que el diámetro del cuello y aun sin hacer presión con el clavo hubiese perdido el conocimiento antes de colocarlo. El Dr. Taveras, el patólogo que declaró como perito de la defensa, opinó que Iris Nereida murió a causa de asfixia por estrangulación, que las fracturas de la laringe pudieron ocurrir después de la muerte (al manipularse descuidadamente el cadáver) y que existía la posibilidad de que Iris Nereida se suicidara usando su cinturón y el clavo en forma de torniquete. Este testigo añadió que las dos vueltas que tenía el cinturón alrededor del cuello era "índice sospechoso del suicidio", sobre todo en vista de que no se encontraron contusiones, heridas, abrasiones u otras señales de violencia en el cuerpo de la víctima.

La evidencia circunstancial incontrovertida estableció que el 7 de septiembre de 1950, aproximadamente a las 11 de la noche, el acusado enterró el cadáver de Iris Nereida en el fondo de la fosa número 4 del Cementerio Fournier. En esa fecha había una línea de 15 fosas en dicho cementerio que no tenían piso. El acusado llegó el 7 de septiembre de 1950 a las 9 de la mañana al cementerio y recibió una llamada por teléfono como a las 11 a. m. Le dijo al celador, Juan Ponce López, que la llamada telefónica había sido hecha por Lucy, hermana de Iris Nereida, "que me llamó para decirme que Iris se fue con el novio". Enseguida el acusado se fue del cementerio en su automóvil Cadillac. Regresó como a las 3:30 de la tarde en el mismo automóvil, llamó a uno de sus empleados (Gregorio Fargas) y lo mandó a hacer un hoyo en la fosa número 4 "para ver si había agua". El empleado hizo un hoyo en la fosa número 4 de una profundidad de 2 ½ pies a todo lo ancho y lo largo de la fosa. La arena que extrajo al hacer el hoyo la dejó allí cerca, en una esquina. Luego el acusado se fue. Esa misma noche como a las 11 p. m., en su automóvil Cadillac, Fournier regresó al cementerio, habló con Juan Ponce López (el

celador) y le pidió las llaves del cementerio, diciéndole "tengo una cita con una norsita (nurse) y voy a ver si entro al cementerio". El celador le entregó a Fournier las llaves. Como a la media noche regresó el acusado para devolverle las llaves al celador que dormía en una casita cerca del cementerio, y le dijo "Ponce si tú te levantas primero . . . mira a ver si me encuentras un zapato que se le perdió a ella en el cementerio". El acusado estaba un poco sudado. Al día siguiente (8 de septiembre de 1950) Fournier entró al cementerio a las siete menos veinte de la mañana con el celador Juan Ponce López. El hoyo en la fosa número 4 que se había hecho el día anterior estaba tapado con arena. El acusado dió órdenes a sus empleados que hicieran una mezcla de concreto para tirar los pisos de varias fosas, entre las cuales se encontraba la número 4. Cuando los empleados iban a tirar el piso de concreto en la fosa número 4, encontraron que el fondo había sido nivelado, listo para echar el cemento. Por órdenes de Fournier, los empleados tiraron primero el piso de concreto en la fosa número 4. Después el acusado salió del cementerio, cerca de las 8 a. m. Regresó aproximadamente una hora y media más tarde, se bajó del automóvil, hizo un hoyo con una pala entre las fosas quinta y sexta, y allí enterró un paquete que él mismo había sacado de su automóvil Cadillac. El paquete estaba hecho un bollo con las dos puntas torcidas. El día 8 de octubre cuando el fiscal y la policía en el fondo de la fosa número 4 hallaron el cadáver de Iris Nereida, también encontraron al cavar entre las tumbas quinta y sexta ese paquete, con envoltura de un saco de cemento, donde había un zapato blanco de mujer con unas trabillas. Este era el zapato que le faltaba al cadáver de Iris Nereida cuando lo descubrieron en el fondo de la fosa número 4.(³)

---

(³) El Dr. Babbs declaró que el cadáver cuando él lo vió no tenía zapatos. Pero él llegó después que la policía y los obreros habían descubierto el cadáver. Un testigo presencial declaró que mientras se estaba sacando arena para afuera, en el fondo de la fosa número 4, lo primero que apareció fué un zapato que tenía puesto en el pie el cadáver de la

Como una semana después de desaparecer Iris Nereida, sus hermanas Lucy y Aida fueron a visitar al acusado. Lo encontraron en el cementerio trabajando en una tumba. Le preguntaron si sabía que Iris había desaparecido. El acusado contestó que sí. Una de las hermanas le dijo que temían que la hubieran matado y que quien la hubiera matado tenía que ser alguien que tuviera medios de deshacerse de un cadáver. Entonces el acusado se puso nervioso, pálido y tembloroso. Contestó que eso no se podía hacer, que para enterrar un cadáver había que llenar muchos papeles y que no había medios de ocultar de la iusticia enterrar un cadáver sin permiso. Añadió que él había visto a Iris Nereida varios días después que ella desapareció, en San Juan, por La Marina, y que estaba muy interesado en ayudar a buscarla. Les propuso un plan: que cuando él le enviara el cheque de $150 para los alimentos de la nena, correspondiente al mes de octubre, Iris Nereida quizás saliera de su escondite, que ella tendría que recogerlo o mandarlo a recoger y entonces podría saberse dónde era que ella estaba y con quién. Además Fournier llevó a una de las hermanas de Iris Nereida a ver una casa grande y otra pequeña que tenía cerca del cementerio para que pudiera constatar que allí no estaba Iris Nereida y dió una vuelta con ella por el cementerio con el mismo propósito.

El día 7 de octubre de 1950 por la mañana el acusado fue "detenido para investigación" y traído a las oficinas del fiscal. Siguió detenido ilegalmente desde ese momento hasta el día 10 de octubre de 1950. No fue interrogado hasta el tercer día de su detención, pero se le mantuvo incomunicado

---

occisa. El cadáver estaba, como ya hemos dicho, boca abajo y con las piernas dobladas hacia arriba. Los dos zapatos fueron presentados en evidencia y aparecen como Exhibits 30 y 31 de El Pueblo. Por otro lado, debemos señalar que el testimonio incontrovertido de cuatro empleados del cementerio estableció que Fournier el día 8 de septiembre hizo un hoyo entre las fosas quinta y sexta y allí enterró el paquete que se desenterró el 8 de octubre. (Agapito Rosa, Pedro Andino Villalongo, Ernesto Santana Alicea y Gregorio Fargas Ayala.)

sin ver a sus familiares, amigos o abogados. (⁴) Durante
el día se le mantenía detenido en la oficina del fiscal y por
la noche se le llevaba al Cuartel de la Policía a dormir. No
se le sometió a indignidad personal o violencia física de clase
alguna. En ningún momento se le hicieron promesas o ame-
nazas u ofrecimientos para que confesara o declarara. Siem-
pre se le permitió descansar, dormir y alimentarse normal-
mente. En las oficinas del fiscal tenía a su disposición libros
y periódicos, un abanico para refrescarse y una butaca para
descansar y dormir la siesta. Se encontraba allí tranquilo
y de hecho pasó gran parte de su tiempo leyendo novelas
policíacas. La cama donde durmió en el cuartel de la poli-
cía, en las noches del 7 al 8 de octubre y del 8 al 9 de octu-
bre, tenía colchón, sábanas y almohadas. Según la decla-
ración incontrovertida del fiscal Viera Martínez: (1) el
acusado no pidió nunca ver a un familiar ni a un abogado,
y (2) ningún familiar o abogado del acusado solicitó verlo
a él. El Sr. Ramírez Brau, periodista, declaró a preguntas
de la defensa, que vió al acusado en fiscalía el día 7 de octu-
bre durante el día; que no pudo hablar con él pero que lo
vió tranquilo, leyendo un libro, y que había un detective con
el acusado. Este mismo testigo declaró, también a preguntas
de la defensa, que sin permiso de la policía, entró a las 2:30
de la madrugada de la noche del 7 al 8 de octubre en el cuar-
tel de la policía de San Juan en la calle San Francisco.
Habló allí con el acusado que estaba acostado en una cama.
Le pidió al acusado un retrato de Iris Nereida y el acusado
le indicó que fuera a la Escuela Superior y consiguiera el
anuario del año en que ella se graduó donde había un retrato
en que estaba muy bonita. Ramírez Brau dijo al acusado
que el fiscal iba a abrir unas tumbas en el cementerio por-
que tenía indicios de que allí estaba enterrada la occisa. El

---

(⁴) Sin embargo, como señalamos más adelante, el Sr. Ramírez Brau
(periodista) habló con el acusado en la noche del 7 al 8 de octubre, y
en la noche del 9 al 10 de octubre un primo segundo del acusado (lla-
mado Henry Hernández) vió y habló con Fournier.

acusado se encolerizó y le contestó: "Dígale al fiscal que se acuerde que yo tengo allí 1,700 tumbas y que por cada una que destape tendrá que pagar $10", y que le iba a dar una bofetada al fiscal. Este testigo también declaró que la cama en que estaba el acusado tenía colchón, sábanas y almohadas limpias. Cuando se descubrió el cadáver de Iris Nereida el 8 de octubre en el Cementerio Fournier, el fiscal ordenó que se trajera al acusado al cementerio a ese sitio. Había allí periodistas, fotógrafos y detectives. El fiscal le hizo tres o cuatro preguntas al acusado, pidiéndole que dijera de quién era el cadáver. De acuerdo con la evidencia que se sometió en el primer juicio, el acusado miraba hacia la tumba, se mantenía nervioso y turbado y cada vez que se le pedía que identificara el cadáver temblaba. Sin embargo, sobre ese incidente la prueba presentada en el segundo juicio fue la siguiente: (1) el Fiscal Viera Martínez declaró a preguntas de la defensa lo siguiente: "P. ¿Con qué fin usted confrontó al acusado con el cadáver? R. Para que me explicara cómo era posible que en su cementerio y en una fosa había el cadáver de una mujer, boca abajo y sin una caja, y para que él que era el condueño de aquel cementerio me dijera sobre aquél cadáver que estaba enterrado clandestinamente, según todas las apariencias. P. ¿Y cómo se condujo el acusado cuando usted lo llevó al cementerio y le mostró el cadáver? ¿Estaba nervioso o no estaba nervioso? R. No estaba nervioso. Con absoluta serenidad miró la tumba y yo le pregunté que qué era aquello y a pesar de que el cadáver no era perceptible para identificarlo por la espalda, dijo que era el cadáver de una mujer. Yo le pregunté: '¿De qué mujer?', y él me dijo: 'De una mujer'. Yo le dije: '¿De una mujer clandestinamente enterrada?' y a eso no contestó. P. ¿Y usted le siguió haciendo preguntas a él? ¿Qué otra pregunta le hizo? R. No más de esas que le he dicho"; y (2) el Sr. Ramírez Brau declaró a preguntas de la defensa, después de expresar que él vió al acusado en el Cementerio Fournier en la tarde del día 8 de octubre, lo siguiente:

"P. Testigo, y cuando usted lo vió en el cementerio, ¿cuál era la actitud del acusado? ¿qué usted le vió hacer frente al cadáver de Iris Nereida? R. Cuando llegó allí frente al cadáver el fiscal le preguntó que qué era aquello y entonces el acusado le respondió: 'el cadáver de una mujer.' Punto. P. ¿Y él cómo se manifestaba? ¿tranquilo, violento, tembloroso o cómo? R. No había violencia y estaba normal. Pude apreciar que no había anormalidad en él. P. ¿Ni tembloroso ni nada? R. Yo no lo ví temblar."

Al acusado se le trajo a fiscalía inmediatamente después del referido incidente en el cementerio el día 8 de octubre. Siguió detenido ilegalmente en las mismas condiciones que ya hemos descrito. El fiscal siguió trabajando desde ese momento hasta el día 9 de octubre por la noche "acumulando hechos y datos". El lunes 9 de octubre a las 10 de la noche el fiscal empezó a interrogar al acusado. El interrogatorio siguió ininterrumpidamente durante seis horas. Se tomó un récord taquigráfico de las preguntas y contestaciones. Al terminar ese intenso interrogatorio el acusado no había confesado. Sin embargo, después de un intervalo de tiempo, empezó a hacer una confesión detallada por escrito que terminó esa madrugada, como a las 6 de la mañana. Aproximadamente seis horas más tarde, ante numerosos periodistas y fotógrafos de prensa, el acusado hizo otra confesión oral en la casa sita en el Barrio San Antón donde había estrangulado a su ex esposa, según la declaración anterior. Confesó allí que había acostado a Iris Nereida sobre una hoja de puerta que colocó sobre una bañera; que le había puesto un cinturón por el cuello; que había pasado un clavo que recogió del piso por el nudo del cinturón; que la había estrangulado usando el cinturón y el clavo como un torniquete; que sacó el cadáver por una ventana y lo colocó en el baúl de su automóvil; que un zapato de la víctima se cayó al piso al pasar el cadáver por la ventana; que había tirado un botón que se desprendió del traje de Iris Nereida fuera de la casa; y que echó por un tubo del sumidero de la casa

las hilachas del cinturón que se le quedaron en las manos al estrangular a Iris Nereida. Más adelante, al discutir el error décimotercero, hemos de analizar con mayor detenimiento todas las circunstancias que rodearon las dos confesiones del acusado. Basta señalar aquí que la primera confesión escrita fue obtenida mediante coacción sicológica, como resolvimos en *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954). Sin embargo en la primera apelación, considerando todas las circunstancias concurrentes, resolvimos que la confesión oral de San Antón no fué involuntaria como cuestión de derecho, por lo cual el Tribunal Superior había procedido correctamente al someterle al jurado la cuestión de si dicha confesión oral fue o no voluntaria.(5) En el segundo juicio se excluyó la primera confesión escrita del acusado. Se presentó en evidencia la segunda confesión oral de San Antón y la prueba sobre la voluntariedad de la misma para que (1) si el jurado determinaba que fue hecha voluntariamente, le diera el peso que creyera conveniente como sucede con cualquier otra evidencia debidamente admitida, o (2) si el jurado resolvía que fue involuntaria, la rechazara e hiciera caso omiso de ella. Habiendo declarado el jurado otra vez culpable a Fournier de asesinato en primer grado, éste vuelve a plantear ahora el punto de si, como cuestión de dere-

---

(5) En nuestra decisión en *Pueblo* v. *Fournier*, supra, 281-89, fue necesario apuntar que las instrucciones dadas al jurado sobre la cuestión de voluntariedad de una confesión no habían sido adecuadas. Como señalaremos más adelante, en el segundo juicio se dieron al jurado instrucciones adecuadas y el apelante en este recurso no plantea ningún error sobre ese particular. La teoría de los abogados de la defensa en el primer juicio fue que el acusado había dado muerte a Iris Nereida, pero que a lo sumo era culpable de homicidio voluntario porque había actuado en un arrebato de cólera. Véase *Pueblo* v. *Fournier*, supra, 277. En el segundo juicio la única prueba presentada por la defensa (aparte de las declaraciones del Fiscal Viera Martínez y del Dr. Troyano de los Ríos que versan sobre la voluntariedad de la confesión oral de San Antón) fue la declaración del Dr. Taveras con la cual el acusado trató de establecer que Iris Nereida se suicidó. El juez sentenciador en el segundo juicio instruyó al jurado adecuadamente no solamente sobre un posible veredicto de inocencia, sino también sobre los veredictos de asesinato en primer grado, asesinato en segundo grado y homicidio voluntario.

cho, la segunda confesión oral de San Antón fue obtenida mediante coacción sicológica. Y además el acusado alega que se cometieron trece errores adicionales.

Discutiremos los errores apuntados por el apelante en el mismo orden que él los presenta en su alegato. Haremos mención a otros hechos y a otra evidencia a medida que sea necesario en la discusión de dichos señalamientos de error.

## I

El primer error señalado es que el tribunal a quo "cometió error al permitir que el fiscal expusiera la teoría de la acusación en forma dirigida a producir en el ánimo del jurado, pasión y prejuicio, así como también la impresión de que el acusado era culpable del delito que se le imputa". Como es sabido en Puerto Rico el fiscal inicia el juicio expresando oralmente ante el jurado la naturaleza del delito que intenta probar, las circunstancias en que se cometió el hecho y los medios de prueba de que pretende valerse para justificar la acusación. Artículo 233 (3) del Código de Enjuiciamiento Criminal, ed. 1935, 34 L.P.R.A. sec. 712 (3). Se queja el apelante de que el fiscal (1) hizo manifestaciones que constituían argumentos; (2) ofreció probar que el acusado tenía que pasar una pensión a Iris Nereida, y luego en el juicio resultó que a quien el acusado pasaba una pensión era a su hija y no a su ex esposa; (3) ofreció probar que Iris Nereida, debido a la vida que le daba el acusado, radicó demanda de divorcio contra este último por la causal de trato cruel e injurias graves, que el acusado fué emplazado en agosto 10 de 1949, y que se dictó sentencia de divorcio el 9 de septiembre de 1949. Según el apelante, esa conducta del fiscal privó al acusado de un juicio imparcial y justo y del debido proceso de ley porque despertó en la mente del jurado pasión y prejuicio en contra del acusado.

No tiene razón. En primer lugar, el fiscal no hizo "argumentos" en su exposición inicial del caso ni tampoco ningún comentario que pudiese inflamar las pasiones del

jurado en contra del acusado. Se limitó estrictamente a reseñar en detalle los hechos que se proponía probar y que estaban relacionados con el caso. Tenía perfecto derecho a hacer eso para informar debidamente al jurado qué controversias éste habría de resolver cuando el caso le fuese sometido. No existe, como alega el apelante, ninguna regla que limite la exposición inicial a los "ultimate facts" del crimen. El fiscal puede detallar en su teoría del caso "las circunstancias en que se cometió el hecho", y aún más, "los medios de prueba de que pretende valerse para justificar la acusación". Así lo dispone expresamente el citado artículo 233 (3) del Código de Enjuiciamiento Criminal. Cf. *Pueblo* v. *Beltrán*, 73 D.P.R. 509, 514–15 (1952); *Pueblo* v. *Carreras*, 62 D.P.R. 156, 158–59 (1943); *Pueblo* v. *Pierantoni*, 60 D.P.R. 13, 15–17 (1942) y *Pueblo* v. *Juarbe*, 37 D.P.R. 463, 464–65 (1927).

En segundo lugar, la afirmación que hizo el fiscal en su teoría o exposición inicial del caso respecto a la pensión alimenticia fue la siguiente: ". . . el acusado tenía que pasar una suma en concepto de alimentos a la Sra. Iris Nereida Hernández Matos, y a su hijita". Esta afirmación no fue objetada por la defensa. (T. E., 2da. pieza, pág. 9–10.) Esto de por sí constituye una renuncia, salvo en casos excepcionales. Véase 28 A.L.R.2d 972, 984–85. Aquí la prueba presentada en el juicio demostró que el acusado sólo tenía que pagar una suma *para alimentos de la niña* a la madre, es decir, a Iris Nereida. El apelante sostiene que la aseveración del fiscal en la exposición inicial fue que "el acusado tenía que pasar una pensión a la interfecta, insinuando con ello, en perjuicio del acusado, que éste la mató para librarse de esa obligación". Es obvio que el fiscal no hizo tal aseveración ni directa ni indirectamente. Basta recordar cuáles fueron las palabras exactas que pronunció el fiscal. Además, en Puerto Rico no constituye error revocable el hecho de que el ministerio fiscal se refiera en la exposición de su teoría a hechos que no son probados pos-

teriormente, si el fiscal ha actuado de buena fe y sus manifestaciones no han ocasionado perjuicio sustancial al acusado. Véase *Pueblo* v. *Díaz*, 74 D.P.R. 375, 382–385 (1953). Esta es la regla que rige también en una inmensa mayoría de los estados americanos. Véanse 28 A.L.R.2d 972, 974–82; y *Abbott's Criminal Trial Practice*, 4ta. ed. 1939, 464–66. En el caso de autos lo que la prueba demostró sobre la pensión alimenticia fue parcialmente distinto a lo que dijo el fiscal. Pero basta leer el récord y examinar la discrepancia para darse cuenta que el fiscal actuó de buena fe y que sus manifestaciones no influyeron en el ánimo del jurado con perjuicio para el acusado. Se trata de un error excusable e insignificante. Cf. *Pueblo* v. *Díaz*, supra; *State* v. *McDonald*, 152 Pac. 1139 (N.M., 1915); *People* v. *Alexander*, 106 P.2d 450, 454 (Cal., 1940).

Por último, en cuanto a las manifestaciones que hizo el fiscal en su exposición inicial del caso sobre los motivos que tuvo Iris Nereida para divorciarse del acusado, sobre el emplazamiento y sobre la sentencia decretando el divorcio, cabe señalar también que en ningún momento fueron objetadas por la defensa. (T.E., 2da. pieza, pág. 10.) Además, en el juicio el fiscal ofreció evidencia tendente a probar lo que dijo: el legajo completo del caso de divorcio entre Iris Nereida y el acusado. Pero el juez sólo admitió en evidencia la sentencia de divorcio y la notificación de la misma. En la sentencia aparece que se disolvió el vínculo matrimonial por trato cruel e injurias graves. Nada indica que el fiscal actuó de mala fe ni que sus manifestaciones ocasionaron perjuicio sustancial al acusado. Por tanto, las referidas manifestaciones del fiscal en su teoría inicial del caso no constituyen conducta impropia ni podrían dar lugar a una revocación. Véanse *Pueblo* v. *Díaz*, supra, 382–85; *State* v. *Myers*, 79 N.W.2d 382, 387 (Iowa, 1956); Fricke, *California Criminal Procedure* (5ta. ed. 1955) 393; 28 A.L.R.2d 972, 974–84. Cf. *Pueblo* v. *Ruiz*, 79 D.P.R. 957,

958–59 (1957) y *People* v. *Gordon*, 163 P.2d 110, 126 (Cal., 1945).

## II

Los seis señalamientos de error siguientes se refieren a alegada conducta impropia del fiscal y del juez en el curso del informe final al jurado. Sostiene el apelante que constituye error revocable que el fiscal manifestara: (1) que como el acusado se adaptó al presidio tan bien como en su casa, basándose en la declaración del siquiatra, ése era el lugar apropiado para el acusado donde el jurado debía mandarlo; (2) que el acusado no sólo cometió un asesinato en primer grado sino que también cometió otro delito al enterrar clandestinamente a Iris Nereida; (3) que el acusado al atar un lazo al cuello de la víctima, lo ató también al cuello de los familiares y al cuello de la niña; (4) que en el futuro cuando haya que contarle a la hija de la víctima dónde está su padre, el jurado no permita que se diga que anda paseando por las calles de San Juan. Sostiene además que el juez erró al no ordenar al taquígrafo que tomara cierta parte del discurso del fiscal ante el jurado cuando la defensa lo solicitó.

Antes de analizar uno por uno los incidentes de que se queja el apelante, nos parece conveniente decir cuáles son los principios de derecho que rigen en Puerto Rico sobre el contenido y forma de los informes finales al jurado. La determinación de las cuestiones de hecho por un jurado exige inferencias que deben derivarse de la evidencia testifical y documental presentada. Para llamar la atención del jurado respecto a dichas inferencias, tanto el fiscal como la defensa tienen que presentarlas en sus argumentos. Por eso, en sus informes finales al jurado, el representante del ministerio público y el abogado defensor pueden comentar la evidencia presentada y tienen amplia libertad para hacer conclusiones, inferencias, deducciones y argumentos derivados de la misma. No importa que dichas conclusiones, inferencias, deducciones y argumentos sean improbables, ilógicos, erróneos o absurdos. Cualquier argumento basado en

la evidencia normalmente es propio y el requisito de que exista base en la evidencia se interpreta muy liberalmente. Pero ningún argumento es lícito si hace referencia a prueba que no fue admitida durante el juicio. Además hay otros límites a lo que constituye un argumento lícito: no se debe inflamar o excitar las pasiones o prejuicios del jurado (1) haciendo referencia a evidencia inadmisible; ó (2) urgiéndole que haga inferencias sin base en la prueba admitida; ó (3) pidiéndole que descarte la evidencia admitida y que funde su veredicto en consideraciones irrelevantes; ó (4) pidiéndole que no pese la evidencia como prescribe la ley; ó (5) invocando prejuicios raciales o económicos en contra del acusado; ó (6) haciendo referencia al hecho de que el acusado se negó a testificar. Por otro lado, las frases y expresiones que se usan en el argumento pueden en casos extremos constituir conducta impropia. Naturalmente pocos veredictos podrían sostenerse si el tribunal de apelación no hiciera concesiones al ardor y a la excitación que caracterizan el juicio. De ordinario no se considera impropio apelar a la simpatía del jurado basándose en la evidencia presentada. Los vuelos de elocuencia, de retórica y de patetismo en los discursos del fiscal y de la defensa son lícitos siempre que no rebasen ciertos límites. Tanto el representante del ministerio público como el abogado de la defensa pueden usar imágenes oratorias, literarias o poéticas y hasta ciertas vituperaciones e invectivas no constituyen necesariamente conducta impropia. Pero esa libertad muy amplia del argumento no puede degenerar en conducta abusiva. Todo depende de los hechos del caso específico. A ese respecto el juez que preside el proceso tiene amplia discreción: él conoce la atmósfera del juicio, oye el énfasis del comentario, aprecia la susceptibilidad de los jurados y el grado de atención que le prestan a ésta o a aquella parte del argumento. Aun suponiendo que el fiscal hizo manifestaciones impropias en su discurso, no procede una revocación a menos que se pruebe que ocasionaron perjuicio a los

derechos sustanciales del acusado, es decir, que el veredicto fue influenciado por esa conducta impropia. Además, la advertencia o instrucción del juez al jurado de que no debe tomar en consideración un argumento impropio del fiscal subsana generalmente cualquier error, salvo en casos excepcionales en que nada podría borrar los efectos perjudiciales contra el acusado. A este respecto igualmente todo depende de las cuestiones envueltas, de las partes y de la atmósfera del juicio. Por eso el juez que preside el proceso tiene aquí también una amplia discreción que sólo debe alterarse si se demuestra que abusó de la misma. Sin duda, dentro de esas normas, el fiscal tiene una libertad considerable que es igual a la que tiene el abogado de la defensa en su discurso ante el jurado. Véanse *Pueblo* v. *Febres*, 78 D.P.R. 893, 900 (1956); *Pueblo* v. *Burgos*, 76 D.P.R. 199, 208–09 (1954); *Pueblo* v. *Archeval*, 74 D.P.R. 512, 518 (1953); *Pueblo* v. *Montes*, 64 D.P.R. 321, 324–25 (1944); *Pueblo* v. *Aspurúa*, 61 D.P.R. 252, 257–58 (1943); *Pueblo* v. *Marrero*, 48 D.P.R. 896, 904–05 (1935); *Pueblo* v. *Marchand Paz*, 53 D.P.R. 671, 680–84 (1938). Véanse además *Pueblo* v. *Rivas*, 68 D.P.R. 474, 482 (1948); *Pueblo* v. *Zayas*, 65 D.P.R. 538, 540–41 (1946); *Pueblo* v. *Colón*, 65 D.P.R. 760, 768–70 (1946); *Pueblo* v. *Yera*, 60 D.P.R. 818 (1942); *Pueblo* v. *Piazza*, 60 D.P.R. 575, 583 (1942); *Pueblo* v. *Cabrera*, 59 D.P.R. 135, 144–45 (1941). Cf. *State* v. *Harless*, 86 N.W.2d 210, 213–14 (Iowa, 1958); *People* v. *Heidman*, 144 N.E.2d 580, 586 (Ill., 1957); *Bowman* v. *Commonwealth*, 290 S.W.2d 814, 816–17 (Ky., 1956); *State* v. *Brown*, 213 P.2d 305, 309 (Wash., 1949); *State* v. *Lane*, 182 S.E. 784, 787–88 (W.Va., 1935); *People* v. *Preston*, 173 N.E. 383, 389 (Ill., 1930); *Stanfill* v. *Commonwealth*, 272 S.W. 1, 3 (Ky., 1925); 88 C.J.S., *Trial*, secs. 169–200.

■ 1. En el curso de su informe final al jurado, el fiscal dijo "que el acusado se adaptó al presidio" e hizo el argumento de que "como él se adapta al presidio tan bien como en su casa, es al presidio donde los jurados deben mandarlo."

Dijo también que el presidio "es el lugar apropiado para el acusado". Como ya señalaremos, el siquiatra Dr. Troyano de los Ríos manifestó que el acusado se encontraba en el penal igual que en su casa, optimista, siempre dispuesto a cooperar y acostumbrado a la disciplina de esa institución. Por tanto, las manifestaciones del fiscal constituyen un argumento basado en la evidencia admitida en el caso. La defensa objetó y el juez que presidía el proceso declaró sin lugar la objeción. Aunque el presente argumento al jurado hubiese podido hacerse más comedidamente, creemos que cae dentro del ámbito de un argumento lícito y que no pudo llevar al ánimo del jurado la creencia de que no podía rendir un veredicto absolutorio si a su juicio procedía. Tampoco consideramos que haya sido perjudicial a los derechos sustanciales del acusado ni que sea suficiente para justificar la revocación de la sentencia. *Cf. Pueblo* v. *Febres*, 78 D.P.R. 893, 900 (1956); *Pueblo* v. *Burgos*, 76 D.P.R. 199, 208–09 (1954); *People* v. *Halteman*, 139 N.E.2d 286, 292–93 (Ill., 1957); *State* v. *Brown*, 213 P.2d 305, 309 (Wash., 1949); *Ladd* v. *State*, 207 P.2d 350, 358–59 (Okla., 1949); *State* v. *Lane*, 182 S.E. 784, 787–88 (W.Va., 1935) y *People* v. *Preston*, 173 N.E. 383, 389 (Ill., 1930).

2. En su turno de rectificación el fiscal dijo que "de la prueba circunstancial aparece que el acusado no tan sólo cometió un asesinato en primer grado, sino que también cometió otro delito que es el de haberla enterrado clandestinamente". Cuando la defensa objetó, el juez expresó que "el fiscal está hablando de que el acusado la enterró y sobre esos extremos se extendieron los abogados de la defensa al analizar el incidente ese que el fiscal le llama delito". El juez se negó a ordenar al fiscal que no siguiera argumentando sobre el enterramiento clandestino de Iris Nereida por el acusado. Debe señalarse que en la acusación se imputó al acusado haber dado muerte a Iris Nereida con malicia y premeditación y además haber "enterrado clandestinamente el cadáver de la mencionada Iris Nereida Hernández Matos

en el Cementerio Fournier de Isla Verde". La defensa no planteó objeción alguna a los términos en que estaba redactada la acusación. La prueba circunstancial incontrovertida presentada en el juicio demostró que el acusado enterró clandestinamente el cadávar de Iris Nereida, bajo el piso de concreto en la fosa número 4 del Cementerio Fournier, entre 11 y 12 p.m. del día 7 de septiembre de 1950. Como dijimos en *Pueblo* v. *Archeval*, 74 D.P.R. 512, 515 (1953): "la regla general es al efecto de que en un proceso criminal . . . no es admisible prueba sobre otros delitos cometidos por el acusado. Por excepción, evidencia sobre otros delitos es admisible cuando el delito anterior es un hecho material para establecer la comisión del crimen imputado, o cuando el mismo forma parte del *res gestæ* o cuando se presente dicha prueba para demostrar motivo, intención, premeditación, malicia o un plan común, o cuando ambos delitos forman parte de una misma transacción". Véanse además *Pueblo* v. *Román*, 70 D.P.R. 50 (1949) y *Pueblo* v. *Pérez*, 47 D.P.R. 765 (1934). Aun sin haber alegación a ese efecto, El Pueblo podía presentar prueba contra el acusado en relación con la ocultación del cadáver de Iris Nereida y su enterramiento clandestino. Véanse *Pueblo* v. *Marín*, 38 D.P.R. 666, 671–72 (1928); 1 Morgan, *Basic Problems of Evidence* (1954) 188–89; 2 Wigmore *On Evidence*, (3ra. ed., 1940) secs. 300–73; 1 *Wharton's Criminal Evidence* (12ma. ed., 1955) secs. 233–42. El argumento del fiscal se ajustó a la prueba que había sido debidamente admitida en el juicio y es obvio que no constituyó conducta impropia alguna calificar como delito ese acto del acusado en su informe de rectificación al jurado. Véanse *State* v. *Lane*, 182 S.E. 784, 787–88 (W.Va., 1935); *Browder* v. *Commonwealth*, 22 S.W.2d 615, 617 (Ky., 1929). *Cf. Pueblo* v. *Archeval*, 74 D.P.R. 512, 518 (1953).

3. En su turno de rectificación ante el jurado el fiscal dijo que "el acusado al atar el lazo al cuello de la víctima, ató el lazo al cuello de los familiares y al cuello de la niña".

La defensa objetó y el juez hizo la siguiente advertencia al jurado en relación con las manifestaciones del fiscal: "Aquí nadie ha entendido que le han amarrado lazo alguno al cuello de la familia de la víctima ni al cuello de la hija de la víctima. Eso es meramente una figura literaria que fue dicha en esa forma. Aquí la única prueba es que ataron un lazo, o se ató ella misma, al cuello de Iris Nereida y entonces el fiscal dice esa cosa . . . pero fue una figura literaria y no se tomarán en cuenta las manifestaciones del fiscal como hechos probados sino como una figura literaria". El abogado de la defensa añadió "eso es una metáfora" y el juez le dijo al jurado: "ya lo dijo (el abogado de la defensa) que es una metáfora". Creemos que el comentario del fiscal no rebasa los límites de la elocuencia y del patetismo que de ordinario se permiten en casos de esta naturaleza. Véanse *Pueblo* v. *Burgos*, 76 D.P.R. 199, 208–09 (1954); *People* v. *Preston*, 173 N.E. 383, 389 (Ill., 1930) y *Stanfill* v. *Commonwealth*, 272 S.W. 1, 3 (Ky., (1925). En todo caso, aunque el comentario del fiscal fuera impropio, el juez que presidía el proceso indicó al jurado que no lo tomara en cuenta. Dicha instrucción se dió inmediatamente y en forma concreta. Por tanto, cualquier posible error quedó subsanado y no se vulneraron los derechos sustanciales del acusado. Véanse *Pueblo* v. *Rivas*, 68 D.P.R. 474, 482 (1948); *Pueblo* v. *Zayas*, 65 D.P.R. 538, 540–41 (1946); *Pueblo* v. *Yera*, 60 D.P.R. 818 (1942); *Pueblo* v. *Cabrera*, 59 D.P.R. 135, 144–45 (1941). *Cf. United States* v. *Johnson*, 129 F.2d 954, 962–63 (C.A. 3, 1942).

4. En su turno de rectificación el fiscal dijo al jurado que "cuando haya que contarle a la hija de la víctima de dónde estará su padre . . . no permita que se diga que anda paseando por las calles de San Juan." La defensa objetó y el juez que presidía el proceso le indicó al jurado que "eso lo dijo el fiscal en un arrebato literario que (el abogado de la defensa) no le permitió terminar". El apelante alega ahora que así se permitió al fiscal apelar a los

sentimientos, pasiones y prejuicios del jurado para inducirlo a rendir un veredicto condenatorio. A nuestro juicio ese argumento constituye una desviación de la buena práctica. Sin embargo, en vista de todos los hechos de este caso, no creemos que justifique la revocación de la sentencia. En *Bowman* v. *Commonwealth*, 290 S.W.2d 814, 816–17 (Ky., 1956) en un proceso por asesinato y violación de una señora de 72 años de edad, el fiscal en su informe al jurado dijo que la víctima no podría contarle lo que pasó esa noche terrible en su habitación y añadió "¿Qué hay de todas las viejecitas, madres y viudas que viven solas y a cuyas casas vienen sirvientes? ¿Debemos nosotros exponerlas a la misma suerte? ¿Debemos dejarlas sufrir porque no tenemos los pantalones de mandar al patíbulo a este hombre?" La Corte Suprema de Kentucky consideró que ese comentario no justificaba la revocación de la sentencia. En *State* v. *Baker*, 192 P.2d 839, 842 (Wash., 1948), en un caso por el delito de violación, el fiscal dijo al jurado en su informe: "Pero si ustedes no encuentran culpable al acusado van a ponerlo en la calle otra vez y ustedes o la esposa de uno de ustedes van a despertarse un día y van a encontrar que la misma cosa les ha sucedido a ustedes". La Corte Suprema del Estado de Washington resolvió que esas manifestaciones no constituían error perjudicial para el acusado. En *State* v. *Zakoura*, 68 P.2d 11, 16 (Ky., 1937), el fiscal dijo al jurado "Caballeros, cuando ustedes se retiren a deliberar no se olviden de las hermanas llenas de lágrimas, no se olviden de los familiares de la víctima que están llenos de dolor". Se resolvió que esto no excedía los límites de un argumento lícito y que no constituía error perjudicial para el acusado. En *Vincent* v. *State*, 165 So. 844, 847 (Ala. 1936), el representante del ministerio público dijo a los jurados en su informe que el estado no les pedía que hicieran una mujer viuda y que la dejaran sola ante los problemas de la vida. La corte resolvió que no procedía la revocación de la sentencia. Expresó que aunque no aprobaba esa forma de des-

pertar los sentimientos del jurado, probablemente en presencia de una viuda llorosa, sin embargo no debía impedirse un argumento ante el jurado sobre las consecuencias del crimen. En *Stanfill* v. *Commonwealth*, 272 S.W. 1, 3 (Ky., 1925), en un proceso por un delito de asesinato, el fiscal dijo al jurado en su informe que los padres de la víctima habían venido desde Virginia a ver el juicio del asesino de su hijo y que ellos no debían decepcionarlos con un veredicto diciendo que el estado de Kentucky condonaba el crimen al dejar libre al acusado. Se resolvió que esto no justificaba la revocación de la sentencia. Sin duda, las manifestaciones hechas al jurado en dichos casos van mucho más lejos que las que ahora consideramos. Además aquí el juez ante el jurado explicó que el fiscal hacía ese argumento en un "arrebato literario". Por eso, sin expresar aprobación del argumento que hizo el fiscal, luego de examinarlo en su contexto y a la luz de las circunstancias y de la naturaleza del caso, estamos convencidos de que no amerita una revocación. Nos parece obvio que el juez que presidió el proceso no abusó de su discreción al permitirle al fiscal hacer dicho argumento, calificándolo de "arrebato literario". Por las razones que indicamos anteriormente, sólo cuando el juez sentenciador abusa de su discreción al determinar qué argumentos son lícitos y qué argumentos perjudican indebidamente al acusado, procedería revocar una sentencia a base de conducta impropia del fiscal en su argumentación ante el jurado. Véanse *Commonwealth* v. *Turza*, 16 A.2d 401, 406–07 (Pa., 1940); *State* v. *Harless*, 86 N.W.2d 210, 213–14 (Iowa, 1958).

5. Cuando el fiscal consumía su turno de rectificación, la defensa solicitó que el juez ordenara al taquígrafo tomar dicho discurso. El juez declaró que "cuando haya alguna objeción se ordena que se tomen aquellas palabras o frases que ha dicho el fiscal", pero se negó a ordenar al taquígrafo que tomara el discurso en su totalidad. Como indicamos en *Pueblo* v. *Vélez*, 77 D.P.R. 817, 819–21 (1955), en las causas criminales que se ventilan ante los tribunales en Puerto Rico,

los taquígrafos nunca toman taquigráficamente los informes que hacen tanto el fiscal como la defensa. Lo mismo ocurre en la mayoría de los estados de la Unión Americana y en las cortes federales. *Cf.* 88 C.J.S., *Trial*, sec. 196. El acusado puede pedir que esos informes sean tomados taquigráficamente y en tal caso el tribunal debe ordenarle al taquígrafo que lo haga. En el caso de autos, la solicitud de la defensa a ese respecto fue tardía. Se hizo en el turno de rectificación del fiscal, cuando ya éste había hecho su informe inicial y la defensa había concluído su discurso ante el jurado. Además, de acuerdo con la práctica usual, el juez que presidió el proceso desde el principio ordenó que cada vez que la defensa presentara objeciones a los comentarios del fiscal, el taquígrafo tomara los argumentos objetados taquigráficamente. Así se hizo siempre. En el récord taquigráfico constan todas las manifestaciones del fiscal que los abogados de la defensa objetaron por considerarlas perjudiciales a los derechos del acusado. Tan pronto la defensa solicitaba que se hicieran constar las manifestaciones del fiscal que creía perjudiciales, el juez ordenaba al taquígrafo que tomara las mismas. Por tanto, no creemos que el acusado aquí sufriera perjuicio alguno por la forma en que actuó el juez sentenciador.

## III

Por el octavo señalamiento sostiene el acusado que el tribunal a quo "cometió error al admitir las fotografías de la tumba y del cadáver de la interfecta contra la objeción del acusado". Alega que dichas fotografías no tendían a probar ningún hecho controvertido y que sólo podían despertar las simpatías y prejuicios del jurado en contra del acusado. No tiene razón. Las fotografías eran admisibles en evidencia: (1) para demostrar el sitio donde se encontró el cadáver y las excavaciones que se llevaron a cabo en el Cementerio Fournier para descubrirlo y (2) para demostrar la forma exacta en que fué enterrada Iris Nereida

en la fosa número 4, la posición en que quedó su cadáver y la manera en que aparecía atado a su cuello el cinturón con un clavo en forma de torniquete. Explicaban y corroboraban lo que declararon los testigos sobre hechos esenciales del caso. Por tanto eran claramente admisibles en evidencia. Ya hemos resuelto que: "El mero hecho de que (unas fotografías) pudieran impresionar al jurado en sentido desfavorable al acusado, no justifica su exclusión, siempre que se hayan ofrecido para un propósito legítimo de la acusación". *Pueblo v. Torres*, 75 D.P.R. 231, 234 (1953). El fiscal las ofreció aquí con un propósito legítimo y no con el único fin de crear prejuicio en la mente del jurado. En esas circunstancias su admisión no lesionó ningún derecho del acusado. Véanse *Pueblo v. Rivera*, 69 D.P.R. 538, 541 (1949) y *Pueblo v. Zayas*, 65 D.P.R. 538, 541 (1946). Naturalmente las fotografías de un cadáver resultan repulsivas, pero ese hecho no significa que contengan exposiciones grotescas o que sean inadmisibles porque impresionan al jurado. En este caso todas las fotografías fueron tomadas con exactitud y representaban fielmente los hechos sobre los cuales distintos testigos habían tratado de dar una descripción oral. No hay duda de que fueron admitidas correctamente en evidencia. *Cf. Pueblo v. Márquez*, 67 D.P.R. 326, 335, (1947).

Las normas sobre la admisibilidad de las fotografías del cadáver y de la tumba que acabamos de mencionar y de aplicar al caso de autos, contrario a lo que alega el apelante, están reconocidas por la doctrina y la jurisprudencia. Véanse 3 Wigmore *on Evidence* (3ra. ed., 1940), secs. 792–98; 2 Wharton's *Criminal Evidence* (12ma. ed., 1955), sec. 686; 1 Underhill's *Criminal Evidence* (5ta, ed., 1956), sec. 117. Hay abundante jurisprudencia en el mismo sentido. Véanse *State v. Triplett*, 79 N.W.2d 391, 397–98 (Iowa, 1956); *Commonwealth v. Noxon*, 66 N.E.2d 814, 840 (Mass., 1946); *Commonwealth v. Gray*, 49 N.E.2d 603, 604 (Mass., 1943) y *State v. Heinz*, 275 N.W. 10, 16 (Iowa,

1937). Aún más: se ha permitido mostrar al jurado en un juicio diapositivos en colores proyectados sobre un telón y así ampliados, representando un cadáver y las condiciones reveladas por la autopsia del mismo, en un caso criminal por el asesinato de una niña de 15 años. Véase *Commonwealth* v. *Makarewicz*, 132 N.E.2d 294, 299 (Mass., 1956).

## IV

Los cuatro señalamientos de error siguientes se refieren a ciertas instrucciones que solicitó la defensa y que fueron denegadas por el juez sentenciador. El apelante solicitó que el juez diera las siguientes instrucciones al jurado: (1) "La Corte instruye a los señores del jurado que si ustedes llegan a la conclusión de que la confesión de San Antón es involuntaria, deben de desechar todo el testimonio de los testigos Ramírez Brau, Sánchez Ortiz, Casenave y Laureano y no tomarlo en cuenta para nada esto es como si no hubiese declarado"; (2) "La Corte instruye a los señores del jurado que si llegan a la conclusión de que la confesión oral de San Antón es involuntaria, la prueba de El Pueblo ofrecida es prueba circunstancial; y no hay prueba directa de cómo ocurrió la muerte. Es para ustedes determinar si con esta prueba circunstancial se ha probado más allá de duda razonable si el acusado ha cometido el delito de asesinato en primer grado"; (3) "Caballeros del jurado, la ausencia de motivo o de todo aparente móvil para cometer el delito es una fuerte circunstancia en favor del acusado; y en casos que dependan de evidencia circunstancial, como ocurriría en el que se está ventilando si se llegara a descartar por ustedes, por involuntaria, la confesión del acusado en San Antón, no es sólo el motivo o móvil relevante al caso, y sí a veces es elemento de vital importancia"; (4) "Caballeros del jurado, cualquier conducta que haya observado el acusado en relación con el cuerpo de Iris Nereida Hernández Matos después de haber tenido lugar la muerte de ésta, aunque sea pertinente a los fines de conectar al acusado con el hecho de la muerte, no

es suficiente para establecer la culpabilidad del acusado, ni para probar su premeditación en relación con dicha muerte." El tribunal *a quo* denegó estas cuatro solicitudes de instrucciones.

Creemos que las instrucciones especiales así solicitadas estaban sustancialmente comprendidas en las instrucciones generales y especiales que *sua sponte* dio el juez al jurado. Además, las solicitudes de instrucciones especiales 1, 3 y 4 estaban redactadas en forma tal que producían confusión, tendían indebidamente a favorecer la causa del acusado y hubiesen podido inducir en error al jurado. El tribunal de instancia puede, sin cometer error alguno, denegar semejantes instrucciones especiales. Véanse *Pueblo* v. *Santiago*, 78 D.P.R. 659, 671 (1955); *Pueblo* v. *Lampón*, 78 D.P.R. 109, 115 (1955); *Pueblo* v. *Jiménez*, 78 D.P.R. 7, 16 (1955); *Pueblo* v. *Vélez*, 77 D.P.R. 817, 821–23 (1955); *Pueblo* v. *López*, 77 D.P.R. 607, 615, 623 (1954); *Pueblo* v. *Castro*, 72 D.P.R. 96, 110 (1951); *Pueblo* v. *Baerga*, 70 D.P.R. 90, 93 (1949); *Pueblo* v. *Rodríguez*, 66 D.P.R. 317, 327–28 (1946).[5]

La solicitud de instrucción Núm. 1 era innecesaria ya que, aun considerándola correcta, estaba sustancialmente comprendida en las instrucciones que se trasmitieron al jurado sobre la confesión oral de San Antón. En efecto, el juez sentenciador instruyó al jurado como sigue: "Señores del jurado, si luego de examinar ustedes todos los hechos y circunstancias en que ocurrieron las confesiones que ya les he dicho y que como cuestión de derecho tanto la Núm. 42 como la 43 son inadmisibles y que solamente las considerarán ustedes para determinar sobre la voluntariedad de la declaración de San Antón; llegan ustedes a la conclusión de

---

[5] *Cf. People* v. *Moses,* 142 N.E.2d 1, 4 (Ill., 1957); *State* v. *Tolson,* 82 N.W.2d 105, 110 (Iowa, 1957); *Commonwealth* v. *Agiasottelis,* 142 N.E.2d 386, 388–89 (Mass., 1957); *State* v. *Eubanks,* 94 So.2d 262, 268 (La., 1957); *State* v. *Colvin,* 307 P.2d 98, 104 (Ariz., 1957); *People* v. *Nunn,* 296 P.2d 813, 820 (Cal., 1956); *People* v. *Hays,* 225 P.2d 600, 605 (Cal., 1950).

que la de San Antón fue involuntaria, o sea, que el Fiscal no ha probado afirmativamente que la de San Antón fue voluntaria, entonces ustedes la desechan y no la toman en consideración para nada al resolver este caso . . ." (T. E., 6ta. pieza, pág. 281.) Más adelante el juez repitió: "Si por el resultado de la prueba y del análisis que ustedes hagan, ustedes llegan a la conclusión de que el Fiscal no les probó afirmativamente y fuera de duda razonable que la coacción sicológica que existió cuando se tomaron las confesiones en Fiscalía habían dejado de existir cuando se produjo la confesión en San Antón, entonces ustedes deben descartar definitivamente la confesión de San Antón." (T. E., 6ta. pieza, pág. 109.) Por otro lado, al admitirse la evidencia consistente en los testimonios de los señores Ramírez Brau, Sánchez Ortiz, Casenave y Laureano, no se limitó su efecto a un solo propósito. Esto es así aunque de hecho dichas declaraciones versaron sobre circunstancias que principalmente concernían la voluntariedad de la declaración oral en San Antón. Por tanto, el apelante no tenía derecho a una instrucción especial de cautela y de limitación como la que solicitó en relación con el testimonio de los señores Ramírez Brau, Sánchez Ortiz, Casenave y Laureano. *Cf. Nye & Nissen* v. *United States*, 108 F.2d 846, 857 (C. A. 9, 1948); *Abbott's Criminal Trial Practice* (1939) sec. 682.

■ No podemos comprender cómo el apelante imputa error al tribunal *a quo* por no haber trasmitido al jurado la segunda solicitud de instrucción. En efecto, el juez sentenciador instruyó al jurado casi en las mismas palabras que propuso el abogado de la defensa en esta segunda solicitud de instrucción. Les dijo lo siguiente: "Si ustedes resuelven que la declaración o confesión de San Antón es involuntaria . . . en ese caso lo que queda es un caso de evidencia circunstancial o prueba de indicios y yo les voy a explicar lo que es evidencia circunstancial. Existen dos clases de prueba reconocidas y admitidas en las cortes de justicia, y

en virtud de cualquiera de ellas puede el jurado encontrar a un acusado culpable de un delito. Una de ellas es el testimonio directo o positivo de un testigo ocular respecto a la comisión del delito. Esta se llama prueba directa. La otra clase de prueba es aquella por testimonio de una serie de acontecimientos entrelazados entre sí, que tienden a señalar, de una manera suficientemente poderosa, la comisión de un delito por el acusado. Esta es conocida como prueba circunstancial o de indicios . . . La Corte instruye al jurado que para declarar culpable al acusado por evidencia circunstancial solamente, es necesario, no sólo que todas las circunstancias concurran para demostrar que él cometió el delito de que se le acusa, sino que ellas son inconsistentes con cualquier otra conclusión razonable . . . Es decir, que en casos de prueba de indicios deben probarse hechos que sean no solamente compatibles con la culpabilidad del acusado, sino que también sean incompatibles con toda razonable hipótesis de inocencia; y cada hecho aislado del que se ha de hacer la deducción de culpabilidad, debe demostrarse por medio de pruebas que satisfagan el ánimo y la conciencia del jurado en el mismo grado en que es necesario satisfacerlos con respecto al hecho en cuestión en casos en que la prueba sea directa." (T. E., 6ta. pieza, págs. 110–12.) Ya el tribunal había instruído debidamente al jurado de que la culpabilidad del acusado debía demostrarse siempre más allá de duda razonable y había definido adecuadamente el concepto de "culpabilidad fuera de duda razonable". Por tanto, el magistrado que presidió el proceso fue en verdad más explícito y más favorable al acusado, respecto al punto que cubre la solicitud de instrucción Núm. 2, que lo que reclamó la defensa.

██ Creemos que era innecesario trasmitir al jurado la solicitud de instrucción Núm. 3. En primer lugar, el magistrado en sus instrucciones al jurado había definido ya con toda precisión las normas bajo las cuales se debía determinar si el acusado era culpable de asesinato en primer

grado ("premeditación", "malicia", "deliberación", "voluntariedad", etc.), y también había dado instrucciones específicas y adecuadas sobre lo que constituía (1) asesinato en segundo grado y (2) homicidio voluntario. Por otro lado, había suficiente evidencia circunstancial de la cual el jurado hubiese podido inferir un motivo o móvil para el crimen, y en consecuencia, la denegatoria de la instrucción Núm. 3 estaba plenamente justificada. Véase *Roeder* v. *State*, 227 N.W. 446, 448 (Neb., 1929). *Cf. California Jury Instructions—Criminal* (1946) 61–62. En todo caso, la corte no tiene que instruir al jurado sobre la ausencia de motivo o móvil para el crimen si (1) hay prueba clara y convincente de que se cometió el delito. Véase *Evans* v. *State*, 155 N.E. 203 (Ind., 1927); (2) la intención ha sido demostrada por evidencia circunstancial. Véase *State* v. *Leonard*, 112 N.W. 784 (Iowa, 1907).

 La cuarta solicitud de instrucción tampoco procedía. Ya el magistrado había instruído al jurado en forma clara y precisa sobre todos los elementos del delito de asesinato en primer grado, de asesinato en segundo grado y de homicidio voluntario. Había explicado en qué consistía la "premeditación" y qué norma era aplicable para determinar la culpabilidad del acusado. El tribunal de instancia no viene obligado a dar las instrucciones al jurado usando las palabras exactas que solicita la defensa, ni en forma que pueda confundir al jurado o favorecer indebidamente al acusado. Véanse *Pueblo* v. *Martí*, 43 D.P.R. 441, 442 (1932); *Pueblo* v. *Ramírez*, 50 D.P.R. 234, 255–57 (1936); *Pueblo* v. *Nieves*, 57 D.P.R. 784, 801 (1940); *State* v. *Rogers*, 116 A.2d 37, 48 (N.J., 1955); *People* v. *Halteman*, 139 N.E.2d 286, 293 (Ill., 1957). Por otro lado, cuando el jurado regresó a la sala *motu proprio* y solicitó instrucciones adicionales, el tribunal volvió a explicar en detalle lo que constituía asesinato en primer grado, asesinato en segundo grado y homicidio voluntario, subrayando el sentido de los términos "voluntariamente", "premeditación", "deliberación" y "ma-

licia". En ese momento uno de los jurados, a nombre de los demás, preguntó al juez lo siguiente: ". . . en un homicidio, por el hecho que luego se maltrate el cadáver, ¿varía en algo la clasificación esa que ha hecho el señor Juez?" A eso contestó el magistrado: "No, señor; no varía en nada." (T.E., 6ta. pieza, pág. 106.) Esto basta para demostrar que, en todo caso, el acusado no sufrió perjuicio alguno al negarse el juez a trasmitir al jurado la solicitud de instrucción Núm. 4.

## V

En el décimotercer señalamiento se asevera que erró el tribunal *a quo* " . . . *al admitir en evidencia, como cuestión de derecho, la confesión oral hecha por el acusado en el Barrio San Antón*". Es preciso indicar que, acatando nuestro fallo en *Pueblo* v. *Fournier*, supra, 258–61, el Tribunal Superior procedió a determinar preliminarmente (en ausencia del jurado) si la confesión oral de San Antón fue o no voluntaria como cuestión de derecho. El magistrado tuvo en cuenta todos los hechos y circunstancias que ocurrieron antes de la primera confesión escrita (Exhibit 42 de El Pueblo) y las influencias coactivas de carácter sicológico que provocaron dicha declaración escrita en la madrugada del día 10 de octubre de 1950. A ese respecto tomó en consideración la naturaleza, forma y contenido del interrogatorio que el Fiscal hizo al acusado durante seis horas en la noche del 9 al 10 de octubre (Exhibit 43 de El Pueblo). Examinó ese interrogatorio y la primera confesión escrita únicamente en relación con la voluntariedad de la segunda confesión oral. El Juez también consideró el testimonio de los señores Luis de Casenave, Enrique Ramírez Brau, Jesús Laureano, Ernesto Sánchez Ortiz y Henry Hernández, que el Ministerio Público presentó a fin de establecer la voluntariedad de la segunda confesión oral en San Antón. Asimismo pesó la evidencia que consiste (1) en una serie de 12 fotografías tomadas cuando el acusado hacía su confesión oral en San

Antón, y (2) en una serie de 5 fotografías que fueron toma-
das al acusado entre 8 y 10 a.m. del 10 de octubre de 1950
antes de hacer el viaje hasta San Antón. Por último, el
Juez consideró la declaración del Fiscal Viera Martínez que
la defensa presentó como testigo en relación con la cuestión
preliminar de voluntariedad. A base de toda esa prueba,
resolvió que la confesión oral de San Antón no era involun-
taria como cuestión de derecho; que la evidencia sobre ese
punto era contradictoria; y que correspondía al jurado
determinar si fue hecha voluntariamente o no, dándole el
peso que creyera conveniente si resolvía que era voluntaria
o haciendo caso omiso de ella si resolvía que era involuntaria.

Entonces se llamó al jurado a sala y las partes presenta-
ron de nuevo la evidencia relativa a la voluntariedad de la
confesión oral que hizo el acusado en San Antón. Ante el
jurado volvieron a declarar los Sres. Enrique Ramírez Brau,
Jesús Laureano, Ernesto Sánchez Ortiz y Luis de Casenave
como testigos de El Pueblo. También se presentó y se admi-
tió en evidencia: (1) las 12 fotografías tomadas en San
Antón, y (2) las 5 fotografías del acusado tomadas entre
8 y 10 a.m. del 10 de octubre de 1950 antes de hacer el viaje
a San Antón. Además prestaron declaración, como testigos
de la defensa, el patólogo José E. Taveras y el siquiatra
Dr. Rafael Troyano de los Ríos. El jurado tuvo ante sí los
Exhibits 42 y 43 de El Pueblo que contienen (1) la primera
confesión escrita que el acusado hizo antes de las 6 de la
mañana del día 10 de octubre de 1950, y (2) todo el interro-
gatorio a que fue sometido el acusado por el Fiscal durante
seis horas en la noche del 9 al 10 de octubre de ese año.
Estos dos exhibits corresponden al Exhibit 48 y al Exhibit
A del primer proceso a que aludimos en *Pueblo* v. *Fournier*,
77 D.P.R. 222 (1954). Fueron admitidos en evidencia para
un fin limitado: demostrar qué influencias coercitivas moti-
varon la primera confesión. Por otro lado, como indicare-
mos más adelante, el tribunal sentenciador dio instrucciones
específicas al jurado de que dichos exhibits no podrían con-

siderarse en relación con la culpabilidad del acusado y de que sólo eran pertinentes en cuanto a la voluntariedad de la segunda confesión oral. Ambos exhibits fueron admitidos en evidencia para ser considerados por el jurado en esa forma sin objeción de la defensa (T.E., 5ta. pieza, págs. 765 y 770). En este recurso el acusado no ha suscitado cuestión alguna relativa a la admisibilidad en evidencia de dichos exhibits y a las instrucciones que el Juez transmitió al jurado sobre los mismos.

Ajustándose a lo que indicamos en *Pueblo* v. *Fournier*, supra, 289–92, sobre las instrucciones que debían darse al jurado respecto a la cuestión de voluntariedad, el juez sentenciador fijó las siguientes pautas al instruir al jurado:

"Debo instruirles que el contenido de los Exhibits 42 y 43 del Pueblo que contienen admisiones y confesiones del acusado hechas en Fiscalía en la noche del 9 y la madrugada del 10 de octubre de 1950, dichas confesiones y admisiones del acusado son nulas, ya que dichas confesiones y admisiones fueron obtenidas del acusado en forma involuntaria por razón de haberse producido las mismas cuando dicho acusado se encontraba detenido ilegalmente, incomunicado durante tres días, sin asistencia de abogado y luego de haber sido sometido a un interrogatorio durante varias horas durante la noche de ese día, factores que resultaron en una coacción sicológica del acusado como cuestión de derecho.

"En otras palabras, ustedes no pueden analizar esas confesiones que están admitidas por la Corte, a los efectos de determinar la veracidad del contenido de ellas. Solamente las podrán tomar en consideración y las deberán tomar en consideración a los fines de determinar sobre la voluntariedad de la confesión oral hecha por el acusado en el Barrio San Antón.

"En este punto debo decirles, además, que esas confesiones contenidas en los Exhibits 42 y 43, deberán tomarlas en consideración únicamente para determinar si la coacción sicológica de que fue objeto el acusado para que diera esas dos confesiones antes mencionadas, se extendió y acompañó al acusado hasta producir la confesión oral obtenida del acusado en el Barrio San Antón.

"En otras palabras, para determinar sobre la voluntariedad o falta de voluntariedad de la confesión oral que se produjo en San Antón.

"Debo instruir a ustedes que a los fines de determinar la culpabilidad o inocencia del acusado no deben tomar en consideración la veracidad o falta de veracidad del contenido de los Exhibits 42 y 43 de este proceso que equivalen a los Exhibits 48 y A del primer juicio.

"Señores del Jurado, existe la presunción o la inferencia de que la confesión oral prestada por el acusado en San Antón fue obtenida mediante coacción sicológica y es deber y obligación del fiscal destruir esa presunción o esa inferencia.

"La presunción de que fue involuntaria y de que fue obtenida mediante coacción, acompañó al acusado en San Antón y es deber del fiscal destruir dicha presunción.

"Tal presunción de coacción que acompañó al acusado durante la declaración prestada en San Antón, sólo puede destruirse o vencerse si los señores del Jurado consideran que la evidencia ofrecida por el Pueblo demuestra, fuera de toda duda razonable, que dichas influencias de coacción habían cesado antes del acusado prestar su confesión oral en San Antón.

"Señores del Jurado, si ustedes tienen duda razonable en cuanto a si el Fiscal ha destruído o no dicha presunción de coacción cuando el acusado prestaba su declaración en San Antón, es deber y obligación de ustedes dar el beneficio de la duda al acusado y descartar definitivamente tal declaración de San Antón a los fines de resolver este caso.

"Para ustedes determinar si las influencias coercitivas se prolongaron desde Fiscalía cuando se tomaron las declaraciones Exhibits 42 y 43 hasta el Barrio de San Antón, ustedes deberán tomar en consideración cuatro (4) factores, a saber:

"Primero: El historial personal del acusado según fue explicado por los testigos y resumido por el Juez;

"Segundo: Deben tomar en consideración el hecho de que el acusado estuvo ilegalmente detenido durante tres días sin oportunidad de consultar con sus abogados o sus familiares y amigos;

"Tercero: Deben tomar en consideración el interrogatorio a que fue sometido el acusado, según aparece de los Exhibits 42 y 43;

"Cuarto: Y deben tomar en consideración la naturaleza del Exhibit 43, según se desprende del otro exhibit.

"Es decir, que deben tomar en consideración los dos exhibits y la naturaleza y contenido de ellos, a los fines de determinar sobre la voluntariedad o involuntariedad de la declaración prestada por el acusado en San Antón.

"El historial del acusado, no solamente aparece de ese exhibit que les he dicho, sino que aparece también del testimonio del Dr. Troyano de los Ríos respecto a la investigación que hizo cuando fue a clasificar a Fournier mientras estuvo en el Presidio.

"Debo informar a ustedes señores del Jurado que de acuerdo con la evidencia presentada, la detención del acusado fue ilegal mientras estuvo en Fiscalía y también mientras estuvo en San Antón prestando la declaración que prestó en dicho lugar.

"Deben ustedes tomar en consideración, según aparezca de los exhibits y testimonios aquí prestados por uno y otro testigo, los hechos y circunstancias todas en que se produjeron las confesiones del acusado en Fiscalía y también los hechos y circunstancias que rodearon la confesión del acusado en San Antón.

"Señores del Jurado, si luego de examinar ustedes todos los hechos y circunstancias en que ocurrieron las confesiones que ya les he dicho y que como cuestión de derecho tanto la Núm. 42 como la Núm. 43 son inadmisibles y que solamente las considerarán ustedes para determinar sobre la voluntariedad de la declaración de San Antón; llegan ustedes a la conclusión de que la de San Antón fue involuntaria, o sea, que el Fiscal no ha probado afirmativamente que la de San Antón fue voluntaria, entonces ustedes la desechan y no la toman en consideración para nada al resolver este caso y ante tal situación, deben descartarlas las tres (3) y no tomar en consideración ninguna de las tres: ni la 42, ni la 43 ni la de San Antón.

"Si por el contrario llegan a la conclusión de que el Fiscal, fuera de toda duda razonable, ha probado la voluntariedad de la declaración de San Antón, entonces solamente tomarán en consideración la declaración de San Antón, ya que las otras dos únicamente las han de utilizar para determinar sobre la voluntariedad de la de San Antón. De manera que si llegan a la conclusión de que la de San Antón fue voluntaria, únicamente han de utilizar la de San Antón y no han de usar las otras dos que son los Exhibits 42 y 43, ya que éstas están descartadas como cuestión de derecho.

" . . . . . . . .

"Los señores Jurados son los jueces de los hechos, los llamados a apreciar la prueba y a declarar, por el resultado de la misma, si consideran probados los hechos alegados por el fiscal, o los alegados por la defensa.

"La ley no exige un determinado número de testigos para la comprobación de un hecho o circunstancia. Un solo testigo que merezca entero crédito puede ser suficiente para la comprobación de un hecho o circunstancia, salvo perjurio o traición.

"Tampoco exige la ley aquel grado de prueba, que excluyendo toda posibilidad de error, produzca absoluta certeza, porque tal prueba es rara vez posible. Sólo se exige la certeza moral o aquel grado de prueba que produzca convicción en un ánimo no prevenido.

"El efecto de la evidencia no es arbitrario, sino que debe ejercerse con discreción jurídica y subordinación a las reglas de evidencia. El Jurado no tiene derecho a prescindir de la evidencia admitida por la corte, ni tampoco a desechar arbitrariamente la declaración de un testigo. Y está en el deber de considerar cuidadosamente toda la evidencia presentada en el caso.

" . . . . . . . .

"Ustedes son los que van a determinar si las condiciones continuaron o no y para determinar eso tienen que tomar en consideración los Exhibits 42 y 43 y las circunstancias que rodearon esas confesiones y las circunstancias que rodearon la confesión de San Antón.

"Si por el resultado de la prueba y del análisis que ustedes hagan, ustedes llegan a la conclusión de que el Fiscal no les probó afirmativamente y fuera de duda razonable que la coacción sicológica que existió cuando se tomaron las confesiones en Fiscalía había dejado de existir cuando se produjo la confesión en San Antón; entonces ustedes deben descartar definitivamente la confesión de San Antón.

"El Doctor Troyano de los Ríos declaró sobre el carácter del acusado y yo en eso fui extenso. Declaró además que en su opinión la actitud sicológica o la opresión sicológica del acusado pudo continuar en San Antón y agravarse además. Eso dijo el Dr. Troyano de los Ríos.

" . . . . . . . .

"Si ustedes resuelven que la declaración o confesión de San Antón es involuntaria, o sea, que el fiscal no les probó fuera de duda razonable de que fue voluntaria, ustedes tienen que descartar la de San Antón y las otras dos que son los Exhibits 42 y 43, a los fines de determinar sobre la inocencia o culpabilidad del acusado y no pueden considerar ninguna de las tres.

"En ese caso lo que queda es un caso de evidencia circunstancial o prueba de indicios y yo les voy a explicar lo que es evidencia circunstancial.

"Existen dos clases de prueba reconocidas y admitidas en las cortes de justicia, y en virtud de cualquiera de ellas puede el Jurado encontrar a un acusado culpable de un delito. Una de ellas es el testimonio directo o positivo de un testigo ocular respecto a la comisión del delito. Esta se llama prueba directa. La otra clase de prueba es aquella por testimonio de una serie de acontecimientos entrelazados entre sí, que tienden a señalar, de una manera suficientemente poderosa, la comisión de un delito por el acusado. Esta es conocida como prueba circunstancial o de indicios. La misma puede consistir en: 1)—admisiones del acusado; 2)—amenazas hechas con anterioridad a la comisión del crimen tendientes a demostrar que existía por parte suya animosidad contra la víctima; y 3)—planes concertados para la comisión del delito; así como cualquier acto, declaración o circunstancia, admitidos en evidencia, que tienden a enlazar al acusado con la comisión del delito.

"Nada hay en la naturaleza de la prueba circunstancial o de indicios que la haga menos segura que la otra clase de prueba, o sea, la directa. La Corte instruye al Jurado que para declarar culpable al acusado por evidencia circunstancial solamente, es necesario, no sólo que todas las circunstancias concurran para demostrar que él cometió el delito de que se le acusa, sino que ellas son inconsistentes con cualquiera otra conclusión razonable. No es suficiente que las circunstancias probadas coincidan, concuerden y hagan probable la hipótesis buscada para establecer el objeto de la acusación, sino que deben excluir cualquiera otra hipótesis fuera de la culpabilidad. Es decir, que en casos de prueba de indicios deben probarse hechos que sean no solamente compatibles con la culpabilidad del acusado, sino que también sean incompatibles con toda razonable hipótesis de inocencia; y cada hecho aislado del que se ha de hacer la deducción de culpabilidad, debe demostrarse por medio de pruebas que satisfagan el ánimo y la conciencia del jurado

en el mismo grado en que es necesario satisfacerlas con respecto al hecho en cuestión en casos en que la prueba sea directa." ([7])

Como el jurado rindió un veredicto general de culpabilidad, por el delito de asesinato en primer grado que se imputaba al acusado, resulta imposible determinar a ciencia cierta si halló la confesión oral de San Antón voluntaria, y por consiguiente, la apreció junto con la demás evidencia. Sin embargo, independientemente de la conclusión preliminar del juez sentenciador y del veredicto del jurado, hemos de determinar si *de hecho* la confesión oral del acusado en este caso fue obtenida mediante coacción, en violación del debido proceso de ley. Esta es la regla que debemos aplicar bajo la cláusula del debido proceso de ley de la Constitución de Puerto Rico. Véase *Pueblo* v. *Fournier*, supra. Además constituye la norma establecida por la Corte Suprema de los Estados Unidos al amparo del debido proceso de ley de la Enmienda XIV. Véanse *Malinski* v. *New York*, 324 U.S. 401, 404 (1945); *Haley* v. *Ohio*, 332 U.S. 596, 599 (1948); *Payne* v. *Arkansas*, 26 U.S.L.W. 4281 (1958); *Thomas* v. *Arizona*, 26 U.S.L.W. 4312, 4313 (1958). A ese respecto nuestra investigación sobre la cuestión de coacción está limitada a los hechos admitidos o incontrovertidos que surgen del récord. Nuestra función no es pesar la evidencia *de novo* para determinar los hechos básicos respecto a las circunstancias que produjeron la confesión. Por norma general, no podemos alterar en apelación las conclusiones de hechos (expresas o implícitas) basadas en evidencia sustancial si existe conflicto sobre las circunstancias que motivaron la confesión cuyo carácter voluntario se impugna. Pero sí corresponde a este Tribunal el deber de hacer sus propias determinaciones sobre la cuestión de coacción *fundándose en los hechos admitidos o en evidencia no controvertida sobre las circunstancias relativas a la voluntariedad de la confesión.* *Payne* v. *Arkansas*, supra; *Thomas* v. *Arizona*, supra,

([7]) Véase T.E., 6ta. pieza, págs. 76–82, 83, 108–09, 110–12.

y los casos allí citados; *Pueblo* v. *Fournier*, supra, 259–61, 281–87. Cf. Maguire, *Involuntary Confessions*, 31 Tulane L. Rev. 125, 132 (1956). En este caso existe una inferencia o presunción al efecto de que la influencia coercitiva que motivó la primera confesión escrita también produjo la segunda confesión oral de San Antón. Pero es obvio que el alcance de esta inferencia no puede apreciarse en abstracto. Hay que tener en cuenta el tipo específico de coacción que se usó para obtener la primera confesión del acusado. Y sólo un análisis de la totalidad de las circunstancias concretas que rodearon la segunda confesión puede indicar si la influencia coercitiva que provocó la primera se había disipado cuando el acusado confesó oralmente en San Antón. Véanse *Lyons* v. *Oklahoma*, 322 U.S. 596 (1944); *United States* v. *Bayer*, 331 U.S. 532 (1947); *Stroble* v. *California*, 343 U.S. 181 (1952); *Leyra* v. *Denno*, 347 U.S. 556 (1954); *Commonwealth* v. *Makarewicz*, 132 N.E.2d 294 (Mass., 1956); *Jackson* v. *State*, 121 A.2d 242 (Md., 1956); *State* v. *Whiteman*, 67 N.W.2d 599 (N.D., 1954). Por eso, la piedra de toque siempre consiste en "... *pesar las circunstancias opresivas contra la facultad de resistencia de la persona que confesó.*" *Stein* v. *New York*, 346 U.S. 156, 185 (1953); *Fikes* v. *Alabama*, 352 U.S. 191, 197 (1957); *Thomas* v. *Arizona*, 26 U.S.L.W. 4312, 4313 (1958). La cuestión estriba, pues, en determinar si los hechos admitidos o incontrovertidos son irreconciliables con la libertad mental del acusado para confesar libremente en San Antón su presunta participación en el crimen. A ese fin, procederemos a analizar todas las circunstancias relativas a la confesión oral de San Antón según constan en el récord del caso. Ante todo es preciso reseñar brevemente aquí las pruebas y testimonios presentados en evidencia, a saber:

(1) El testimonio del Sr. *Luis de Casenave*, fotógrafo del periódico El Mundo, quien declaró como sigue: El 10 de octubre de 1950, como a las 11 de la mañana, él estuvo en la casa sita en el Barrio San Antón de Carolina; dicha

casa estaba en proceso de construcción; no tenía puertas ni ventanas y el piso estaba sin terminar; en ese momento estaban allí el acusado, el fiscal, varios periodistas, varios fotógrafos de prensa y varios detectives. Identificó varias fotografías de la casa y otras dos fotografías que él también tomó personalmente donde aparece el acusado señalando hacia una hoja de puerta sobre una bañera dentro de la casa. Vio cuando el acusado, antes de tomarse la fotografía, colocó la hoja de puerta sobre la bañera y le oyó decir en ese momento que había acostado sobre esa puerta a Iris Nereida. Al decir esas palabras el acusado *"estaba pasivo, tranquilo, no estaba molesto"* y físicamente estaba en las mismas condiciones que en el día del segundo juicio. El acusado utilizaba sus manos y posó libremente para que se le tomara dicha fotografía. Los periodistas allí presentes le hacían preguntas al acusado y éste se conducía *"cortésmente"* con ellos. Identificó otra fotografía tomada por él personalmente que muestra al acusado señalando por el hueco de una ventana hacia el lado norte de la casa. Fournier decía en ese momento que había sacado el cadáver de Iris Nereida por allí. Al tomársele esa fotografía *"cada vez que se le hacía una pregunta* (el acusado) *la contestaba tranquilo, sin excitarse"*. Identificó otra fotografía que él tomó personalmente donde el acusado aparece señalando hacia el piso de la casa. Fournier hizo ese gesto cuando alguien le preguntó dónde había caído un zapato que se le había extraviado. En ese momento el acusado actuaba libremente. Mientras Casenave permaneció allí no se atropelló al acusado, *"ni se le hizo nada a él en la casa"* y Casenave estuvo allí hasta que todos se montaron en el automóvil para salir de regreso a San Juan. Identificó otra fotografía que él tomó personalmente donde aparece el acusado con varias otras personas buscando un botón a la salida de la casa. La última fotografía que Casenave tomó allí muestra al acusado y al fiscal, rodeados de periodistas y detectives en las afueras de la casa. En ese instante el fiscal le dijo a los periodistas *"ya el acusado*

*confesó"*, entonces los periodistas *"le hicieron un coro"* y el acusado se quedó allí en el grupo. En San Antón no había ningún familiar o abogado del acusado. Los periodistas le hacían preguntas al acusado y a veces el fiscal, mientras se tomaban las distintas fotografías, pero el fiscal nunca le sugería al acusado lo que él debía contestar.

(2) Doce fotografías tomadas en San Antón a que se refiere tanto el testimonio de Casenave como el de los demás testigos posteriores, presentadas en evidencia como Exhibit 37 de El Pueblo. En ellas puede apreciarse a vista de ojos que la condición física del acusado mientras hacía la confesión de San Antón era normal. No aparece ni soñoliento, ni cansado, ni molesto. Además se ve que estaba actuando y posando libremente y con despreocupación. Su rostro no denota angustia ni pesar. Aparece tranquilo en todas ellas. No esconde su mirada, sino que se vira y mira directamente hacia el fotógrafo en muchas de ellas. Aun a través de las gafas ahumadas que tenía puestas, al acusado se le notan los ojos atentos y alertas. Tiene una sombra de barba, pero está bien peinado y aseado. Lleva ropa limpia y bien planchada (zapatos negros, pantalón oscuro, camisa sport sin corbata, y chaqueta clara). El acusado está en calma, haciendo gestos o señales y rodeado por numerosos reporteros allí presentes: Ramírez Brau, Medina Deliz, Sánchez Ortiz, etc.

(3) El testimonio del Sr. *Enrique Ramírez Brau*, periodista, quien declaró como sigue: Conocía al acusado que era *"hijo de un amigo mío que yo quise mucho"* y estuvo en la casa de San Antón el 10 de octubre de 1950. *"Era una casita a medio construir"*, sin ventanas, ni puertas, ni pisos. Llegó allí más o menos a las 11:30 de la mañana y vio al acusado con el fiscal, varios detectives, varios periodistas y varios fotógrafos de prensa. Identificó las fotografías de la casa que forman parte del Exhibit 37 de El Pueblo a que se había referido el testigo Casenave. Refiriéndose a las fotografías donde aparece el acusado señalando hacia una hoja

de puerta sobre una bañera, explicó que fue el propio acusado que puso esa hoja de puerta allí y que en esos instantes el acusado dijo que sobre la misma había colocado a Iris Nereida, la había estrangulado con el cinturón que ella llevaba puesto al cinto, había trasladado su cadáver desde el cuarto de baño a través de la sala o comedor de la casa, lo había sacado por una ventana hasta el automóvil y lo había metido en el baúl de su automóvil. El acusado dijo que de no haber el fiscal esclarecido los hechos del caso, él los hubiera dado a conocer para diciembre. En todo momento el acusado explicaba esos hechos *"en forma apacible, como si fuera un actor . . . las manifestaciones que él hacía en relación con la forma de cómo había dado muerte a la víctima lo hizo* (sic) *con ánimo sereno, apacible y tranquilo"*. Nadie en forma alguna presionó, coaccionó o intimidó al acusado cuando él explicaba la forma y manera en que había dado muerte a Iris Nereida. El acusado hablaba con los distintos periodistas y funcionarios allí presentes, se conducía siempre *"muy amistosamente"*; y *"no estaba impedido ni de ningún otro modo cohibido de moverse ni de hablar . . . y se expresaba con serenidad"*. Refiriéndose a dos de las fotografías del Exhibit 37 de El Pueblo, explicó que en una aparece el acusado *"cuando él explicaba la forma en que sacó el cadáver . . ."* (por el hueco de un ventanal) y que *"en esa ocasión estaba tranquilo y sereno y hacía esas manifestaciones espontáneamente"*; y que en la otra el acusado aparece *"en el cuarto de aseo de la casa de San Antón, está señalando porque él buscaba un botón que dijo que se le había saltado del traje a Iris Nereida y en esos momentos estaba señalando por donde él cree que pudo haber caído"*. En la última fotografía tomada en la parte exterior de la casa, junto con el acusado, el fiscal y un grupo de periodistas y detectives, aparece él (Ramírez Brau) tomando las palabras textuales dichas por el acusado *"en relación con que él hubiera declarado los hechos de no haber sido esclarecidos los mismos por el fiscal antes del mes de diciembre"*. En

San Antón estaban presentes cinco o seis periodistas, tres fotógrafos de la prensa, cinco o seis detectives, una mujer detective, el fiscal, el taquígrafo de fiscalía y un fotógrafo de la policía; no había allí ningún familiar o abogado del acusado. No recuerda que el fiscal le hiciera al acusado advertencias en cuanto a su derecho de no declarar. El acusado allí dijo que para estrangular a Iris Nereida usó un clavo que había encontrado en el piso de la casa, pero no mencionó en ningún momento que cuando estrangulaba a Iris Nereida estuviera con coraje o lleno de ira. A preguntas de la defensa, declaró que él vio al acusado en la madrugada del 7 al 8 de octubre en el cuartel de la policía de la calle San Francisco en San Juan, que se sentó al borde de la cama donde estaba el acusado, que ésta tenía colchón, sábanas y almohadas limpias, que le habló al acusado, pidiéndole un retrato de Iris Nereida para publicarlo y que entonces el acusado le contestó *"búscate el anuario de la Escuela Superior de Santurce, P. R. del año 1945 donde ella aparece fotografiada y está muy bonita ahí"*; que en esa ocasión le dijo a Fournier que el fiscal iba a ir al día siguiente al cementerio porque tenía información de que allí estaba el cadáver de Iris Nereida y que tendría que destapar las fosas; que entonces el acusado, con coraje, le dijo *"diga al fiscal que tengo allí alrededor de 1,800 tumbas y que me tiene que pagar $10 por cada una que abra"*; que el acusado en ese momento estaba con coraje mientras que en San Antón estaba tranquilo y apacible; que el acusado le dijo en ese momento que si el fiscal seguía molestándolo le iba a dar "una galleta". Nadie en San Antón le preguntó al acusado por qué había privado de la vida a Iris Nereida. Vio al acusado en fiscalía el 7 de octubre durante el día leyendo una novela policíaca, pero no le habló porque a él no le permitían entrevistarse con el acusado en ese momento. Vio que un detective estaba allí en la oficina del fiscal con el acusado. El acusado recibía *"un trato amable"* del fiscal y de los detectives en San Antón y también *"se portaba amablemente con el fiscal*

*y con todas las personas que estaban reunidas allí".* Los periodistas *"trataban amistosamente* (al acusado), *en el sentido de que él se comportaba con mucha amabilidad mientras reconstruía la escena del crimen".* Fue por iniciativa propia al cementerio el día 8 de octubre a ver el cadáver de Iris Nereida en la fosa. El 10 de octubre de 1950 por la mañana se le informó en fiscalía que el acusado iba a reconstruir el crimen en San Antón y que no había objeción a que los periodistas fueran al sitio.

(4) El testimonio del señor *Jesús Laureano,* detective, quien declaró como sigue: Vio al acusado y al Fiscal montados en un automóvil el 10 de octubre de 1950. Salieron de las oficinas del Fiscal entre 10:30 y 11 de la mañana. Él (Laureano) no iba en el mismo automóvil que el fiscal y el acusado, pero que hizo el viaje en otro que seguía detrás. Al llegar a San Antón media hora más tarde, vio allí a muchos reporteros y fotógrafos de prensa. Refiriéndose a las dos fotografías donde aparece el acusado señalando con su mano derecha hacia una hoja de puerta colocada encima de una bañera, dijo que en ese preciso momento Fournier explicaba que el 7 de septiembre de 1950 había matado allí a Iris Nereida. El acusado dijo específicamente *"Yo cogí y la acosté encima de esa puerta que puse sobre la bañera y después la apreté por el cuello con el cinturón que ella tenía. Entonces después de muerta la cogí y la pasé por encima de una ventana y entonces la puse sobre la ventana y salté y la metí en el baúl de mi carro."* La actitud del acusado cuando estaba explicando esos hechos era la siguiente: *"Estaba completamente tranquilo allí como si hubiese estado explicando cualquier otro asunto; muy tranquilo; actuaba completamente libre; caminaba para todos los sitios y nos indicaba cómo había hecho su crimen que él estaba explicando allí. Cada vez que un fotógrafo venía a tomar una fotografía él posaba para que se tomara la fotografía. Yo en ningún momento lo ví nervioso; sino completamente tranquilo y afable."* Refiriéndose a otra fotografía que

también es parte del Exhibit 37 de El Pueblo, dijo que en la misma aparecían detectives y periodistas junto con el acusado mientras éste explicaba cómo *"pasó el cadáver por la ventana"*. En otra fotografía el acusado *"está explicando dónde cayó un zapato de ella"*. El acusado *"explicó que al día siguiente lo volvió a buscar allí"*. Identificó unas hilachas del cinturón de Iris Nereida diciendo que en San Antón el acusado *"dijo que se le quedaron en la mano cuando lo apretó . . . y que él las había echado por un tubo del sumidero"*. Añadió que *"entonces nosotros sacamos el tubo en que él alegaba que había echado las hilachas del cinturón . . . y empezamos a sacar lo que había adentro y salió esto. Esto estaba húmedo y estaban pegadas las hilachas y la tierra"*.(⁸) (Exhibit 39 de El Pueblo.) Identificó cinco fotografías que se tomaron al acusado el día 10 de octubre de 1950 *antes* de salir para San Antón en las oficinas del Fiscal Mieres Calimano (Exhibit 32 de El Pueblo). Mientras el acusado explicaba en San Antón cómo había realizado los hechos nadie lo presionó, lo obligó o lo coaccionó y estaba *"muy tranquilo"*, *"muy contento"*. A preguntas de la defensa declaró (1) que vio al acusado por primera vez el día 8 de octubre por la tarde en las oficinas de fiscalía; (2) que el acusado entonces estaba sentado sin hacer nada y que un detective o un secretario del Fiscal lo acompañaba; (3) que volvió a verlo el día 9 en las oficinas del fiscal durante el día; (4) que le consta que el acusado durmió en el cuartel de la policía en la noche del 8 al 9 de octubre; (5) que vio al acusado sentado y tranquilo el día 10 de octubre de 1950 como a las 9 de la mañana en la oficina del fiscal; (6) que había visto al acusado en la noche del 9 al 10 de octubre en las oficinas del fiscal cerca de la media-

---

(⁸) *Por estipulación* se admitió en evidencia en ese momento una serie de clavos que constituyen el Exhibit 38 de El Pueblo, parecidos al clavo que se encontró en el torniquete alrededor del cuello de Iris Nereida, que fueron recogidos en el piso de la casa de San Antón ese mismo día 10 de octubre de 1950.

noche, pero que fue sólo un momento porque él salió poco después; (7) que vio allí en ese momento al fiscal y a un detective junto con el acusado; (8) que él (Laureano) regresó esa noche a fiscalía y estuvo otro rato allí, retirándose como de 3:30 a 4 de la mañana. En el viaje a San Antón el acusado iba en un automóvil con el fiscal y dos detectives. Otros detectives iban en un segundo automóvil siguiendo el primero. El viaje duró aproximadamente media hora. Momentos antes de iniciar el viaje, el fiscal le había dicho que iban a ir a San Antón con Fournier porque éste *"nos va a explicar cómo él cometió su crimen allí"*. No recordó si el fiscal le hizo advertencias al acusado sobre su derecho a no declarar. En San Antón había siete u ocho agentes del orden público, además del Fiscal y su taquígrafo. También estaban presentes numerosos reporteros y fotógrafos de prensa. Explicó, a preguntas de la defensa, que el acusado en San Antón dijo que se le había caído un botón a Iris Nereida y que él lo había recogido y lo había botado. El acusado en San Antón conversaba con todo el mundo, incluyendo a los periodistas, y *"hablaba y andaba por allí libremente"*. Nadie le preguntó al acusado por qué había privado de la vida a Iris Nereida. Declaró en el redirecto que en la noche del 9 al 10 de octubre un primo del acusado, llamado Henry Hernández, estuvo con Fournier en las oficinas del fiscal; que el 8 de octubre estuvo en el cementerio cuando sacaron el cadáver de Iris Nereida de la fosa; que allí había en ese momento 20 ó 25 personas, incluyendo empleados del cementerio; que el Fiscal le hizo muy pocas preguntas al acusado en ese sitio. Aclaró que él fué a buscar a Henry Hernández por órdenes del Fiscal Viera Martínez y lo trajo a fiscalía en la noche del 9 al 10 de octubre de 1950.

(5) El señor *Ernesto Sánchez Ortiz*, periodista, quien declaró como sigue: Estuvo en la casa de San Antón el día 10 de octubre de 1950. Refiriéndose a dos de las fotografías que constituyen el Exhibit 37 de El Pueblo, dijo:

*"Estas dos fotografías representan al acusado señalando con la mano derecha una bañera sobre la cual hay una tabla y él haciendo explicaciones sobre el uso que le dio a esa tabla . . . dijo que colocó esa tabla sobre la bañera y ahí colocó a la difunta* (Iris Nereida) *y que le había puesto un cinturón y había hecho un torniquete con un clavo y la había estrangulado".* Manifestó que otra de las fotografías *"demuestra al acusado explicando cómo pasó el cadáver de Iris Nereida Hernández Matos por esta ventana hasta el vehículo fuera de la casa y luego colocarlo en el baúl del automóvil",* y otra representa *"el acusado . . . señalando hacia el piso donde él alegó que había lanzado un botón del traje de Iris Nereida . . ."* Cuando el acusado describía la forma en que dio muerte a Iris Nereida *"estaba tranquilo y sereno".* Cuando el acusado posaba para esas fotografías *"estaba en actitud pacífica y tranquila".* Entre otros periodistas presentes allí mencionó a los señores Córdova Chirino, Ramírez Brau y Medina Deliz y entre los fotógrafos de prensa al Sr. Casenave de El Mundo, a un fotógrafo de El Imparcial y a otro del Diario de Puerto Rico. A preguntas de la defensa, dijo que había visto al acusado el 7 de octubre de 1950 por la tarde desde lejos en la oficina del fiscal y que no se permitía a los periodistas entrevistarlo en ese momento. El acusado estuvo alrededor de una hora en San Antón hablando y caminando por la casa junto con los periodistas y detectives. Al llegar a San Antón el acusado no estaba esposado. En seguida entraron a la casa hasta un cuarto de baño pequeño y allí el acusado inició la reproducción de la escena del crimen. Inmediatamente el acusado empezó a hablar sobre los hechos, reproduciendo la forma en que había matado a Iris Nereida. De vez en cuando el fiscal le hacía una pregunta, pero nunca estuvieron solos el fiscal y el acusado ni el acusado y los detectives. En San Antón nadie le preguntó al acusado por qué había privado de la vida a Iris Nereida. Allí el acusado explicó el incidente del botón y del traslado del cadáver por la ventana. Además

explicó el acusado que Iris Nereida llevaba el cinturón encima; que él se lo quitó, se lo puso en el cuello y lo usó para estrangularla; que se le quedaron en las manos partículas del cinturón y luego las echó en un tubo del sumidero. Fournier decía todo eso *"voluntariamente"* y no dijo que él estuviera violento cuando estranguló a Iris Nereida. No oyó al fiscal hacer advertencias al acusado de su derecho a no declarar. El acusado dijo que el clavo que usó para hacer el torniquete *"era uno de los clavos que había en el piso, o sea, que tomó uno de los clavos del piso"*. Al terminar toda la reproducción del crimen salieron de la casa y el Fiscal junto al acusado dijo entonces: *"Ya el acusado confesó"*. El fiscal además manifestó allí que el acusado había dicho su propósito de confesar para las Navidades de no haberse descubierto los hechos antes de diciembre. Cuando el fiscal hizo esas manifestaciones en presencia de todos los periodistas que rodeaban al acusado, éste *"aceptó que había dicho eso"*, pero no pudo recordar si lo hizo con sus palabras o asintió con su silencio.

(6) Cinco fotografías del acusado que se tomaron en el cuartel de la policía el 10 de octubre de 1950, entre 8 y 10 a.m., antes de salir para San Antón. Fueron presentadas en evidencia como Exhibit 32 de El Pueblo. En todas aparece el acusado con una camisa sport, sin corbata, con un pantalón oscuro, una chaqueta clara y zapatos negros. Aparece aliñado, en compostura muy normal. Su ropa, en vez de lucir ajada, se ve pulcra y bien planchada. En una de las fotografías aparece el acusado de frente y en otra se le ve de espaldas. Hay dos otras fotografías en que aparece de perfil, en una por el lado izquierdo y en otra por el lado derecho. La última es un *close-up* de la cara del acusado de frente. Tiene una expresión serena y tranquila. No se le nota ningún cansancio, sueño, agobio o angustia en el rostro. Al contrario, tiene una mirada alerta, despreocupada y lúcida. Se nota que el acusado está en perfectas condiciones físicas y aparenta ser un hombre fornido.

Su ropa es idéntica a la que tenía en las fotografías toma-das en San Antón.

(7) El señor *Henry Hernández*, quien declaró como sigue: Es primo segundo del acusado. Habló con éste en fiscalía en la noche del 9 al 10 de octubre y en ese momento Fournier *"estaba tranquilo"*. Estuvo con el acusado esa noche como 15 ó 20 minutos en una oficina al lado de la del fiscal. En ese momento eran aproximadamente las 3 de la mañana. El acusado no se quejó a él del trato que reci-bía. Fue alllí porque el fiscal lo mandó a buscar. A pre-guntas de la defensa, declaró que en ese momento vio allí al fiscal y a unos cuantos detectives, pero no vio a ningún familiar del acusado.

El Ministerio Público anunció que tenía otro testigo sobre la voluntariedad de la confesión prestada por el acu-sado en San Antón pero que renunciaba a su testimonio por ser acumulativo. Entonces la defensa presentó como tes-tigo al fiscal Ángel Viera Martínez en relación con la cues-tión preliminar de la voluntariedad o involuntariedad de la confesión oral de San Antón. Esto ocurrió después de haberse admitido (a los fines limitados que ya señalamos), sin objeción de la defensa, el interrogatorio de seis horas a que fue sometido Fournier en la noche del 9 al 10 de octubre (Exhibit 43 de El Pueblo) y la primera confesión escrita del acusado (Exhibit 42 de El Pueblo).

(8) El fiscal Ángel Viera Martínez declaró como sigue: Se detuvo al acusado *"a los fines de investigación como sos-pechoso"* el 7 de octubre de 1950 por la mañana. Se le mantuvo detenido hasta el 10 de octubre siguiente y durante ese período permaneció incomunicado. Ningún familiar o abogado podía ver al acusado. Este nunca pidió durante ese período ver uno de sus familiares o a un abogado. Ningún abogado trató de entrevistarse con el acusado. El Lic. Gaz-tambide Arrillaga se limitó a preguntar cómo estaba el acusado, pero no solicitó permiso para verlo. Durante el día se mantenía al acusado en las oficinas del fiscal donde

*"estaba muy tranquilo . . . en una butaca. Tenía perió-
dicos a su disposición. Había libros . . . él leyó uno de esos
libros . . . él leyó uno de esos libros. Cogió. . . . uno de
crímenes y criminales que habla de los crímenes en Fran-
cia."* El acusado comía, bebía, dormía y descansaba a
voluntad durante el día. Tenía un abanico para refrescarse,
una butaca para descansar y dormir la siesta y *"estaba
sumamente tranquilo".* Había un detective custodiándolo.
Por la noche se le llevaba a dormir al Cuartel de la Policía
en la calle San Francisco en una cama que tenía colchón,
sábanas y almohadas. Allí durmió dos noches: la del 7 al
8 de octubre y la del 8 al 9 de octubre.

El fiscal Viera Martínez trabajó sin cesar, interrogando
testigos e investigando hechos, durante el 7 y el 8 de octubre.
Todo el domingo 8 de octubre por la mañana lo dedicó a
las excavaciones de distintas fosas del cementerio Fournier
hasta que encontró el cadáver en la número 4. El día 8 de
octubre, como a la 1 de la tarde, el fiscal llevó al acusado
al Cementerio Fournier para confrontarlo con el cadáver que
se había encontrado en la fosa número 4. Dijo que deseaba
pedir explicaciones al acusado de cómo en ese cementerio
había un cadáver boca abajo y sin una caja, ya que Four-
nier era condueño del cementerio y se trataba de un cadáver
enterrado clandestinamente. Explicó que el acusado no
estaba nervioso cuando se le mostró el cadáver; que con abso-
luta serenidad miró la tumba y, a pesar de que el cadáver
no podía identificarse por la espalda, dijo que era el cadáver
de una mujer. Cuando el fiscal le preguntó: *"¿de qué
mujer?",* el acusado contestó: *"de una mujer".* El fiscal
añadió: *"¿de una mujer clandestinamente enterrada?",* y a
eso el acusado no contestó. Esas fueron todas las preguntas
que el fiscal le hizo al acusado en el cementerio el día 8
de octubre. Inmediatamente se trajo a Fournier de nuevo
a fiscalía. Nadie interrogó más al acusado en ningún mo-
mento desde el día 7 de octubre hasta que el fiscal Viera
Martínez comenzó su interrogatorio en la noche del 9 de

octubre. Después tuvo que exhumar el cadáver por la tarde con la ayuda del patólogo, Dr. Babbs. Fué una operación sumamente lenta y difícil. No se pudo llevar a cabo la autopsia ese mismo día. El fiscal siguió trabajando durante todo el día 9 de octubre *"acumulando hechos y datos"* hasta por la noche cuando empezó a interrogar al acusado después de las 10 p. m. Las preguntas y contestaciones se tomaron taquigráficamente.(⁹) Terminó de interrogar a Fournier como a las 4 a. m. cuando el acusado, sin haber confesado, se negó a seguir contestando sus preguntas. Fournier no solicitó que se le dejara dormir en ese momento. Pasó un intervalo de tiempo y luego el acusado hizo una confesión escrita que terminó antes de las 6 de la mañana del día 10 de octubre. El fiscal Viera Martínez le preguntó al acusado en ese momento si quería dormir y éste le dijo que no. El acusado se encontraba *"contento y satisfecho"*. El fiscal le dijo a Fournier: *"Tenemos que ir al campo"*, y el acusado le contestó, *"Cuando usted quiera"*. Entonces el fiscal insistió: *"Vamos a dejarlo para mañana"*, pero el acusado le dijo: *"No, cuando usted quiera"*. Antes de salir para San Antón el acusado no se acostó, pero *"se mantuvo en la oficina sentado, caminó, tomó café en las horas de la mañana (y) se lavó la cara"*.

Los periodistas estaban vigilando todos los movimientos del fiscal y cuando él se proponía salir en automóvil alrededor de las 11 de la mañana del día 10 de octubre para San Antón con el acusado, se encontró con el Sr. Ramírez Brau y otros reporteros. Le preguntaron si podían ir y el fiscal les contestó que sí. Se llevó a Fournier a San Antón para que explicara objetivamente en el sitio todas las cosas que hizo y cómo dio muerte a Iris Nereida. En San Antón el fiscal se limitó a pedir al acusado que explicara con vista al sitio y a la bañera la forma en que había realizado los

---

(⁹) Constan en el Exhibit 43 de El Pueblo a que ya hemos hecho alusión. La defensa en el examen directo, para *"refrescarle la memoria al fiscal"*, le leyó una buena parte ·de este interrogatorio.

hechos. Allí el acusado hizo su confesión oral frente a un sinnúmero de periodistas y fotógrafos a quienes explicaba la forma en que había cometido el crimen. El acusado *"posaba para los fotógrafos en las distintas etapas de los hechos que él realizó"*. Al regresar de San Antón se detuvieron a tomar cocos de agua en Isla Verde y el acusado se tomó uno. Al llegar a la oficina del fiscal, Fournier pidió ver a uno de sus familiares porque quería decir que él había confesado. El fiscal le sugirió nombres, entre ellos a la madre del acusado y a su tía Sara Sampedro. El acusado prefirió ver a su tía Sara Sampedro para no intranquilizar a su madre. Entonces la Sra. Sampedro vio al acusado en la oficina del fiscal. También se entrevistó allí ese mismo día con el Lic. Rubén Gaztambide Arrillaga.

Como dijimos anteriormente, a base de esa prueba el juez declaró que la confesión oral no era involuntaria como cuestión de derecho, y que correspondía al jurado determinar si la influencia coercitiva que produjo la primera confesión, contaminó también la confesión oral de San Antón. Entonces se llamó al jurado a sala y las partes presentaron de nuevo las pruebas y testimonios relativos a la voluntariedad de la confesión oral.

Ante el jurado los Sres. Luis de Casenave, Enrique Ramírez Brau, Jesús Laureano y Ernesto Sánchez Ortiz declararon sustancialmente lo mismo que ante el juez. Sólo vale la pena señalar aquí que: (1) Ramírez Brau añadió haber regresado a las 12:30 p.m. de San Antón a San Juan en el mismo automóvil en que venían el fiscal, el acusado y una señora detective. Se detuvieron en el camino de Isla Verde y el fiscal los obsequió a todos con unos cocos de agua. El acusado en San Antón *"iba contestando espontáneamente"* las preguntas que le hacían los periodistas, mientras daba todas las explicaciones y se tomaban todas las fotografías que aparecen como Exhibit 37 de El Pueblo. El acusado allí se conducía *"en una forma aquietada de espíritu, con una voz suave"*. Entre los periodistas presentes estaban los

Sres. Sánchez Ortiz, Medina Deliz, Rechani, Córdova Chirino y Santiago Sosa; y entre los fotógrafos estaba el Sr. Casenave. (2) Laureano añadió que mientras el acusado daba todas sus explicaciones y hacía su confesión ". . . *estaba completamente tranquilo y libremente. Él caminaba por toda la casa, él delante y nosotros detrás, oyendo lo que él explicaba. Cuando algún fotógrafo venía a tomar fotografías él posaba para retratarse completamente tranquilo*". Todo el mundo en San Antón sabía que ya el acusado había confesado antes, pero nadie allí le leyó al acusado documento alguno o le entregó al acusado un documento para que él lo leyera. (3) Sánchez Ortiz añadió que vio al acusado salir en un automóvil para San Antón como a las 11 a.m. del 10 de octubre de 1950. El acusado *"iba acompañado de detectives pero no iba esposado"*. Al llegar a San Antón el grupo de periodistas y fotógrafos, el fiscal los reunió frente a la casa y los invitó a entrar con el acusado. El acusado entró primero e inmediatamente se dirigió a mano izquierda de la casa a la habitación donde estaba la bañera y allí empezó a hacer su declaración.([10]) Refiriéndose al Exhibit

---

([10]) Durante el contrainterrogatorio ocurrió el siguiente diálogo entre el abogado de la defensa y el testigo Sánchez Ortiz:

"P. ¿Pero antes de empezar el acusado a hacer su declaración; alguien le invitó a que dijera lo que quisiera decir? R. Se suponía que él fuera allí a hacer su declaración. P. ¿En primer lugar; por qué usted suponía eso? R. Porque estábamos allí con ese propósito. P. ¿Quién le extendió a usted esa invitación? R. A mí no me invitó nadie, pero cuando llegué aquí vi que había fotógrafos y periodistas frente a la oficina del fiscal y cuando ellos salieron nos fuimos detrás. P. ¿Usted ya sabía para dónde iban? R. Lo supe en el camino que íbamos para Río Piedras. P. Cuando usted se incorporó a esa caravana de carros ¿sabía de qué se trataba? R. No lo sabía pero sabía que estaba relacionada con la investigación. P. Volvamos atrás. ¿A invitación de quién el acusado empezó a declarar allí lo que usted ha dicho? R. Lo hizo voluntariamente. Sr. Juez: La pregunta es la siguiente: Él empezó a explicar; pero ¿a invitación de quién? R. Supongo que fue a invitación del fiscal. Lic. Ochoteco: ¿El acusado salió hablando allí tan pronto estuvieron ustedes reunidos? R. Tan pronto entramos. P. ¿Una vez dentro de la habitación el acusado salió hablando en seguida o alguien le dijo: 'Diga usted lo que tenga que decir aquí'? R. Así fue; él habló a indicación del fiscal. P. ¿El fiscal le indicó al acusado que dijera lo que tenía que decir? R. Sí, señor. . . . P. Y cuando el acusado explicó lo que

39 de El Pueblo dijo que eran unas partículas de barro con hilachas del cinturón de Iris Nereida y que *"el acusado dijo que las había echado en un tubo y ese tubo estaba en el cuarto de baño y allí mismo se vació el tubo y apareció esta partícula de barro y las partículas del cinturón que el acusado alegó tenía incrustadas en sus manos y que luego echó dentro del tubo y . . . aparecieron allí"*.

Ante el jurado también se presentaron en evidencia: (1) las doce fotografías tomadas en San Antón mientras el acusado hacía su confesión oral el día 10 de octubre de 1950 que ya hemos mencionado anteriormente (Exhibit 37 de El Pueblo) y (2) las cinco fotografías que se tomaron al acusado entre 8 y 10 a.m. el 10 de octubre de 1950 antes de salir para San Antón que ya hemos descrito (Exhibit 32 de El Pueblo).

También declaró ante el jurado el siquiatra Dr. Rafael Troyano de los Ríos, como testigo del acusado, diciendo lo

usted acaba de declarar o mientras él hablaba o después de haber terminado de explicar lo que usted dijo, ¿alguien le hizo preguntas allí? R. Algunos periodistas le hicieron preguntas allí. P. ¿Qué periodistas le hicieron preguntas allí? R. No me acuerdo; yo no le hice ninguna pregunta. P. ¿Quién más le hizo preguntas al acusado allí? R. No recuerdo. P. ¿El fiscal le hizo preguntas? R. No lo ví haciendo preguntas. P. ¿En ningún momento? R. En ningún momento. P. Solamente la actuación del fiscal fue cuando empezó a declarar el acusado dijo usted. ¿Qué fue lo que le dijo el fiscal al acusado cuando llegaron al interior de la casa y ya adentro cuando dice usted: 'Que el fiscal nos reunió a todos'? La pregunta es que ¿qué le dijo el fiscal al acusado? R. Se supone que el fiscal al llevarlo allí era para decir algo y al llegar al interior a esa habitación él empezó a hablar. P. Mi pregunta es ¿que si alguien le dijo: 'Diga usted lo que tenga que decir'? R. Se suponía que él iba a relatar una escena que ya había ocurrido. P. Dígame testigo, ¿se le preguntó por el fiscal o por algún detective o periodista al acusado si alguna persona además de él había intervenido en el acto de darle muerte por estrangulación a Iris Nereida? R. No se le preguntó. P. ¿Se le preguntó allí por el fiscal o por algún agente de orden público; dónde el acusado había tomado a Iris Nereida para llevarla a ese sitio? R. No se le preguntó. P. ¿Se le preguntó al acusado si él había llegado solo a aquel sitio con Iris Nereida en el automóvil o si había venido acompañado de alguien más? R. Yo no se lo pregunté. P. ¿O el fiscal, que usted lo oyera? R. No oí preguntar eso. P. ¿Le escuchó usted al acusado decir si había venido solo o acompañado? R. Él no lo dijo. P. ¿Recuerda usted si usted escuchó al fiscal o a algún detective pre-

siguiente: ([11]) Examinó al acusado en 1953 en la peniten-
ciaría a fin de rendir un informe sobre el grado de custodia
y la asignación de labores. El acusado manifestaba *"una
inmadurez en el desarrollo afectivo de la persona . . . una
super-adaptación al medio"* que indicaba falta de juicio
emocional y que él interpretó *"como un trastorno de la afec-
tividad"*. Encontró una tara sicótica hereditaria tanto por
la línea materna como por la paterna. Además, como hijo
único, criado en el ambiente de una funeraria, el desarrollo
del temperamento afectivo del acusado no había sido nor-
mal. Para el acusado *"un muerto no es otra cosa que un
cliente . . . no existen para él esos lazos de que para un
muerto hay cierta afectividad y respeto; en él eso no existe
y tiene una actitud de una indiferencia absoluta"*. El acu-
sado, en las pruebas sicológicas a que fuera sometido, demos-
tró tener una inteligencia normal y un temperamento extra-
vertido. Las reacciones afectivas y emocionales del acusado

guntar—o que el acusado lo dijera *motu proprio*—de dónde había cogido
el clavo que sirvió de tortor? R. Él dijo que lo había recogido del piso
porque dentro de la casa había madera y clavos. P. Entonces el acu-
sado—según usted—¿dijo que él había cogido el ʻclavo del suelo? R. Sí,
señor; porque allí había más clavos. P. Yo no le pregunto eso. R. Dijo
que sí; que lo había cogido del suelo para hacer el torniquete. P. ¿Le
preguntó alguien al acusado si había traído el clavo de su casa? R. Nadie..
P. ¿Le preguntaron al acusado la forma en que él le había quitado el
cinturón a Iris Nereida? R. No señor. P. ¿No le preguntaron nada,.
ni el fiscal ni ningún detective? R. No señor; que yo oyera no. P. ¿A
qué distancia estaba usted del acusado mientras el acusado hizo el relato
que usted dice? R. Lo estábamos siguiendo por dondequiera que él cami-
naba. P. ¿Usted estaba cerca o lejos del acusado Fournier? R. Yo
estaba cerca. P. ¿Como a qué distancia más o menos? R. Bastante
cerca. P. ¿Como desde donde está usted hasta donde estoy yo? ¿Algo
así? R. Como hasta ahí; como de 4 a 5'. Recuerdo que había mucha.
gente alrededor. Sr. Juez: La distancia que indica el testigo son 5'."

([11]) Como señalamos anteriormente, los otros dos testigos de la defensa.
fueron: (1) el fiscal Viera Martínez, en el incidente preliminar ante
el juez sobre voluntariedad de la confesión oral, y (2) el Dr. José E.
Taveras, patólogo, cuya declaración no tiene nada que ver con el punto
de la voluntariedad de dicha confesión. Con la declaración del Dr. Tave-
ras el acusado trató de probar que Iris Nereida se suicidó, estrangulán-
dose ella misma con el cinturón y el clavo en forma de torniquete, hasta.
producirse la muerte por asfixia.

tenían que ser las mismas en el año 1950 que en el año 1953. El siquiatra dijo *"yo no conozco el estado mental del acusado al terminar el interrogatorio primero, ni conozco tampoco el estado mental ni sicológico del acusado cuando comenzó la declaración de San Antón. Yo lo único que puedo decir es que el estado sicológico del individuo seis horas después tenía que ser igual o muy semejante por lo menos al anterior. ¿Cuál era el estado? Yo no lo sé."* Según el siquiatra, el acusado no es loco, puede distinguir entre el bien y el mal, y no demuestra desbalance síquico. Pero en el acusado *"asomaba ciertas anormalidades en su temperamento"* (de carácter emocional) debidas al ambiente en que se crió. El acusado era hijo único, desde pequeño ayudaba a su padre en el embalsamamiento o manejo de cadáveres y *"esto en una edad de 12 ó 14 años en que el individuo todavía no está cristalizado sino en plena formación, los factores afectivos o temperamentales repercuten en ese ambiente . . . y por eso llegué a decir que para mi Fournier miraba un cadáver como a un cliente . . .".* La ocupación del acusado (embalsamador y agente de pompas funerarias) aumentó los efectos sicológicos antes descritos. El siquiatra declaró que el sueño es un elemento reparador de un desgaste que produce embotamiento para pensar y discurrir; que ciertas personas aguantan más que otras sin dormir; y que la ausencia de sueño afecta el control, la claridad del juicio y las actuaciones de una persona. No puede decir cuál es la resistencia al sueño del acusado y nunca lo ha sometido a pruebas sobre ese particular. Recomendó custodia mediana y trabajo clerical para el acusado en el presidio debido a la preparación académica (estudios de alta escuela, dos años de estudios universitarios en Puerto Rico y varios años más en los Estados Unidos). Los presos de custodia mediana no pueden salir al campo de juegos ni pueden andar libremente por el presidio. El acusado demostró una *"serenidad desmedida"* en el ambiente carcelario. Se adaptó al presidio en tal forma que se encontraba allí

como en su casa y siempre observó una actitud de cooperación absoluta y franca. Es un hombre narcisista, egoísta, y orgulloso de sí mismo.

Esa fue toda la prueba sobre voluntariedad. ¿Demuestra la totalidad de los hechos incontrovertidos o admitidos que la segunda confesión oral de San Antón fue voluntaria o que la misma fue hecha mientras el acusado estaba privado de su libertad mental para confesar o negar su presunta participación en el crimen? La determinación de ese punto depende de una apreciación en cuanto al impacto de todas las circunstancias que hemos reseñado sobre un individuo específico: el acusado. Tenemos que apreciar si la coacción sicológica que vició la primera confesión se prolongó y produjo también la segunda confesión oral de San Antón, o si, por el contrario, la coacción inicial había ya desaparecido en San Antón. Existe una presunción o inferencia de que la influencia coercitiva continuaba en San Antón. *Pueblo* v. *Fournier*, supra, 282. Como ha indicado la Corte Suprema de los Estados Unidos: "Por supuesto después que un acusado deja salir el gato del saco confesando . . . nunca vuelve a estar libre de las desventajas sicológicas y prácticas de haber confesado. El secreto está fuera sin remedio. En ese sentido una confesión posterior podría considerarse como el fruto de la primera. Pero esta Corte nunca ha ido tan lejos como para resolver que hacer una confesión bajo condiciones que excluyen el uso de la misma, inhabilita a perpetuidad al confesante de hacer una que pueda usarse después que esas condiciones han desaparecido". *United States* v. *Bayer*, 331 U.S. 532, 540–41 (1946). Es decir, como se resolvió en *Lyons* v. *Oklahoma*, 322 U.S. 596, 604 (1944), si el efecto de la coacción que produjo la primera confesión se había disipado antes de que el acusado hiciera la segunda confesión, esta última puede ser voluntaria. Esto es cierto sobre todo en casos como el de autos (1) en que la única clase de coacción que se ejerció contra el acusado para obtener la primera confesión fue de carácter sicológico (*i. e.*, la

presión indebida de la detención e incomunicación ilegal durante tres días combinada con un interrogatorio de seis horas extremadamente agresivo hecho por un solo fiscal, ya que nunca se sometió al acusado a ninguna violencia física o indignidad personal, ni se le hicieron amenazas, promesas u ofrecimientos de ninguna índole) ; (2) en que el acusado es un hombre maduro, inteligente y educado, y (3) en que la segunda confesión se hace seis horas después de la primera cuando el acusado está hablando libremente con muchos periodistas y posando ante muchos fotógrafos de prensa en un sitio donde ya no podía sentirse bajo coacción sicológica alguna. Compárense los casos de *Lyons* v. *Oklahoma*, supra; *Stroble* v. *California*, 343 U.S. 181 (1952) ; *Commonwealth* v. *Makarewicz*, 132 N.E. 2d 294 (Mass., 1956) ; y *Burwell* v. *Teets*, 245 F.2d 154 (C.A. 9, 1957), con los de *Leyra* v. *Denno*, 347 U.S. 556 (1954) ; *People* v. *Jones*, 150 P.2d 801 (Cal., 1944) ; *Jackson* v. *State*, 121 A.2d 242 (Md., 1956) ; *State* v. *Whiteman*, 67 N.W.2d 599 (N.D., 1954).

En primer lugar, los factores de presión indebida fueron los que ya señalamos en *Pueblo* v. *Fournier*, supra, 261–77, a saber: (1) Antes de ser interrogado por el fiscal el acusado había estado detenido ilegalmente e incomunicado durante más de tres días sin poder ver a sus amigos, familiares o abogados; (2) En la noche del tercer día de su detención ilegal, el acusado fue interrogado sin interrupción por un fiscal durante seis horas, desde las 10 p.m. hasta las 4 a.m.; (3) Dos días antes de ese interrogatorio el fiscal confrontó al acusado con el cadáver de la víctima; (4) El interrogatorio fue de un carácter tan duro, persistente y agresivo que culminó en una situación en que el acusado se encontraba privado de su libertad mental para confesar o negar los hechos. El factor decisivo de la coacción fue precisamente el carácter de ese interrogatorio (véase *Pueblo* v. *Fournier*, supra, 247–52, 273–74). En breve, podemos repetir aquí la conclusión que formulamos al revisar la primera sentencia contra Fournier: ". . . la forma y natura-

leza del interrogatorio . . . viniendo después de (a) la detención ilegal y su incomunicación durante tres días y (b) del interrogatorio continuo durante seis horas por toda la noche durante el cual el fiscal le dijo al acusado que venía obligado a declarar y que no tenía derecho a asistencia de abogado —produjeron al amanecer una confesión que fue obtenida mediante coacción sicológica . . .", y por eso " . . . la voluntad del acusado fue abrumada y su confesión (escrita) . . . no representaba la expresión de su elección libre y razonada". (Ibid., 275–76.)

Estos son hechos deplorables para una sana administración de la justicia criminal en Puerto Rico y por esa razón los condenamos enérgicamente en nuestra anterior opinión. Pero nuestra investigación se refiere aquí al carácter de la segunda confesión oral que hizo el acusado en San Antón. Por tanto, no se limita a los factores coactivos que invalidaron la primera. Hay una serie de otros factores que rodearon la primera confesión que es preciso tener en cuenta para apreciar si la coacción sicológica ya había cesado cuando el acusado hizo la confesión oral en San Antón. Y asimismo hay que considerar otra serie de factores adicionales que surgen de las circunstancias concretas en que, según la reseña de toda la evidencia que acabamos de hacer, se produjo la segunda confesión oral en San Antón. Procederemos a considerarlos a continuación:

1. El acusado era en 1950 un hombre maduro,[12] inteligente y educado. Había cursado estudios de alta escuela y estudios universitarios en Puerto Rico y en los Estados Unidos. Era condueño y administrador de un próspero negocio de funerarias. No sufría de ningún desbalance mental, a pesar de que un siquiatra lo calificó de *emocionalmente inmaduro*. No se trata pues de una persona de tierna edad como era el acusado en *Haley* v. *Ohio*, 332 U.S. 596 (1948), ni de escasa inteligencia como era el acusado

---

[12] En 1950 tenía más de 23 años según consta en el Exhibit 43 de El Pueblo.

en *Fikes* v. *Alabama*, 352 U.S. 191 (1957). No era analfabeto ni ignorante como los acusados en *Ashcraft* v. *Tennessee*, 322 U.S. 143 (1944) y *Harris* v. *South Carolina*, 338 U.S. 68 (1949). Fournier tenía un temperamento extrovertido y egoísta. Tenía pleno conocimiento de sus derechos legales como lo demostró frente al fiscal durante todo el interrogatorio a que fue sometido en la noche del 9 al 10 de octubre.([13]) *Cf. Stein* v. *New York*, 346 U.S. 156, 185–86 (1953). Es obvio que el acusado, teniendo en cuenta su edad, carácter, experiencia, inteligencia y educación, tenía la capacidad necesaria para recuperar y recuperó su libertad mental poco tiempo después de haber hecho la primera confesión. De hecho, las declaraciones incontrovertidas de todos los testigos que presenciaron lo que ocurrió en San Antón, confirman lo que acabamos de señalar. La opinión del siquiatra al efecto de que el estado mental y sicológico del acusado tenía que ser el mismo en San Antón que seis horas antes en San Juan, tiene a nuestro juicio muy escaso valor frente al cuadro de todos los hechos concretos que dichos testigos relataron sobre lo que pasó en San Antón. La aseveración general del siquiatra no se basó en hechos concretos sobre el estado físico o mental del acusado ni tomó en cuenta el contenido de los conceptos jurídicos de "coacción sicológica" y "libertad mental para confesar". Cualquier conflicto entre la declaración del siquiatra y la de los demás

---

([13]) Acompañamos como apéndice de esta opinión parte de este interrogatorio que aparece en el récord como Exhibit 43 de El Pueblo donde aparece claramente que el acusado siempre estuvo muy consciente de sus derechos legales. El acusado al negar su participación en el crimen decía al fiscal que esclareciera los hechos mediante investigación; que tenía derecho a no contestar insinuaciones directas y acusaciones del fiscal; que no contestaría preguntas que eran acusaciones directas aunque no creía que la contestación lo incriminaría; que "yo vine a contestar sus preguntas voluntariamente contrario a las opiniones de abogados . . . y yo creo que tengo derecho a no contestar nada más", dándole las buenas noches al fiscal; que lo que decía el fiscal eran conclusiones de éste; y a lo último insistió que no diría nada más porque "tengo mis derechos de no contestar".

testigos tendría que resolverse llegando a la conclusión de que el acusado actuaba libre y voluntariamente en San Antón.

2. Aunque al acusado se le mantuvo detenido e incomunicado durante tres días, siempre se le permitió descansar, dormir y alimentarse normalmente. Durante el día permanecía en las oficinas del fiscal leyendo novelas policíacas, sumamente tranquilo, descansando y tenía a su disposición un abanico para refrescarse y una butaca para dormir la siesta. Por la noche se le llevaba al Cuartel de la Policía donde dormía en una cama cómoda que tenía colchón, sábanas y almohadas limpias. Nunca fue interrogado durante ese período hasta que comenzó el interrogatorio del fiscal después de las 10 p.m. del día 9 de octubre. Ese interrogatorio fue llevado a cabo por un solo fiscal durante seis horas. No se trata pues de un caso en que el acusado haya sido interrogado persistentemente durante largos períodos de tiempo por una serie de funcionarios y policías "en relevos" (*relays*), como ocurrió en *Watts* v. *Indiana*, 338 U.S. 49 (1949), *Harris* v. *South Carolina*, 338 U.S. 68 (1949), *Turner* v. *Pennsylvania*, 338 U.S. 62 (1949), y *Ashcraft* v. *Tennessee*, 322 U.S. 143 (1944). Después de terminar el interrogatorio, pasó un intervalo de tiempo. Luego el acusado prestó su confesión escrita que terminó antes de las 6 de la mañana del día 10 de octubre. Debe notarse que la duración del interrogatorio fue mucho menor que en los casos de *Stein* v. *New York*, 346 U.S. 156, 166–69 (1953), *Gallegos* v. *Nebraska*, 342 U.S. 55, 57–59 (1951), y *Lisenba* v. *California*, 314 U.S. 219, 229–32 (1941). A pesar de la naturaleza y forma del interrogatorio que terminó a las 4 de la mañana, ya Fournier se sentía *"contento y satisfecho"* a las 6 a.m. Cuando el fiscal le preguntó en ese momento si él quería dormir, Fournier le contestó que no. Esto no tiene nada de extraño para un hombre de una constitución física tan fornida como la del acusado.[14] Es importante porque

---

[14] Además de que las fotografías tomadas al acusado en San Juan y en San Antón el 10 de octubre de 1950 revelan por sí solas la for-

demuestra que el acusado no estaba ni soñoliento ni agobiado. Antes de salir para San Antón, aunque no se acostó, el acusado estuvo descansando, tomó café y se lavó la cara. Y la demostración más elocuente de las excelentes condiciones en que se encontraba Fournier son las cinco fotografías tomadas entre 8 y 10 de la mañana del día 10 de octubre de 1950 que ya hemos descrito en detalle anteriormente. Demuestran que dos o tres horas antes de San Antón ya Fournier había recobrado el dominio de sus facultades. Su rostro y su mirada no pueden ser los de un hombre cuya voluntad esté rota. Esto también nos lleva a concluir que la ausencia de sueño no jugó ningún papel en la segunda confesión oral de San Antón ni tampoco el estado de tensión a que fue sometido el acusado durante la noche anterior. Eso se comprueba también con las fotografías del acusado tomadas en San Antón mientras hacía su confesión oral y con declaraciones de los testigos presenciales sobre lo que ocurrió en San Antón. Ya hemos reseñado antes dichas fotografías y testimonios.

3. La confrontación del acusado con el cadáver de Iris Nereida el día 8 de octubre en el Cementerio Fournier no constituyó para el acusado una experiencia espeluznante como parecía demostrar la prueba que se presentó en el primer juicio. A ese respecto basta recordar lo que sobre ese incidente declararon, en forma incontrovertida, el periodista Ramírez Brau y el fiscal Viera Martínez. De todos modos, la impresión que hubiese podido dejar en la mente del acusado esta confrontación no pudo surtir efecto dos días después cuando estaba haciendo la confesión oral en San Antón. *Cf. Thomas* v. *Arizona*, 26 U.S.L.W. 4312, 4314, 4315 (1958). En *Lyons* v. *Oklahoma*, 322 U.S. 596 (1944), la primera confesión del acusado se obtuvo después de mantenerlo en la cárcel durante once días, interrogarlo intensa-

---

taleza física de Fournier, hay que señalar lo siguiente: el acusado pesaba en 1950 alrededor de 170 libras y cargó con suma facilidad al hombro al fiscal (que pesaba 175 libras) durante el interrogatorio en la noche del 9 al 10 de octubre de 1950. Véase T.E., Exhibit 43 de El Pueblo, 7ma. pieza, págs. 137–38.

mente por la noche durante más de seis horas, mostrarle un platón con los huesos de la presunta víctima, y ponérselo en su regazo. Después se le llevó a la escena del crimen donde continuó el interrogatorio al día siguiente por la mañana. Doce horas después el alcaide obtuvo del acusado una segunda confesión escrita. La Corte Suprema de los Estados Unidos se negó a anular la sentencia de reclusión perpetua impuesta al acusado después que un jurado lo halló culpable en un juicio donde se presentó en evidencia la segunda confesión, a pesar de declarar que la primera fue obtenida mediante coacción sicológica. Allí se resolvió que la influencia coercitiva que produjo la primera confesión se había disipado cuando el acusado hizo la segunda confesión escrita. Véase además *Commonwealth* v. *Makarewicz*, 132 N.E.2d 294 (Mass., 1956). Lo que acabamos de decir se aplica igualmente al efecto que tuvo sobre la segunda confesión oral en San Antón la conducta del fiscal al enseñarle al acusado durante el interrogatorio en la noche del 9 al 10 de octubre una fotografía del cadáver de Iris Nereida. Ambos incidentes han podido contribuir a que la primera confesión escrita fuera involuntaria. Pero a nuestro juicio, no influyeron sobre el carácter voluntario de la segunda confesión oral. No hay que olvidar además que hubo prueba en el segundo juicio sobre la absoluta insensibilidad de Fournier hacia los cadáveres, llegando a decir el siquiatra que *"para Fournier un cadáver era como un cliente"*.

4. Nunca se le hicieron amenazas, promesas, u ofrecimientos al acusado para que confesara, ni directamente a él ni en relación con un pariente o amigo suyo. Tampoco se sometió al acusado en ningún momento a indignidad personal o violencia física de clase alguna. Eso es cierto tanto antes de la primera confesión escrita, como antes de la segunda confesión oral. No se trata pues de un acusado que confiesa después que se le obliga a desnudarse y a permanecer sin ropa ante la policía durante largas horas como sucedió en *Malinski* v. *New York*, 324 U.S. 401 (1945); ni

de un acusado que confiesa después de recibir golpes u otra clase de maltrato físico como en *Brown* v. *Mississippi*, 297 U.S. 278 (1936) ; *People* v. *Jones*, 150 P.2d 801 (Cal., 1944) ; *Jackson* v. *State*, 121 A.2d 242 (Md., 1956) y *People* v. *Thomlison*, 81 N.E.2d 434 (1948) ; ni de un acusado que confiesa por motivo de amenazas, promesas u ofrecimientos como en *Harris* v. *South Carolina*, 338 U.S. 68 (1949) (donde se amenazó arrestar a la madre del acusado, además de interrogarlo en relevos, etc.), *Williams* v. *State*, 212 S.W.2d 383 (Tenn., 1948) y *State* v. *Whiteman*, 67 N.W.2d 599 (N.D., 1954). No hubo presión alguna ni amenazas de turbas, grupos de gente, o de siquiera un solo ciudadano privado, para que el acusado confesara. *Cf. Payne* v. *Arkansas*, 26 U.S.L.W. 4281, 4282 (1958) y *State* v. *Whiteman*, 67 N.W.2d 599 (N.D., 1954). No se privó de descanso y comida en ningún momento al acusado. Al contrario, ya hemos visto en qué condiciones perfectas se le mantuvo durante el día y la noche en la oficina del fiscal y en el cuartel de la policía. Aquí ciertamente no se trató a Fournier como a los acusados en los casos de *Watts* v. *Indiana*, 338 U.S. 49, 52–54 (1949) y *Payne* v. *Arkansas*, 26 U.S.L.W. 4281, 4282, 4283 (1958). Todos estos hechos son de singular importancia para apreciar el carácter de la segunda confesión. Es obvio que el *tipo* y *grado* de la coacción que produjo la primera confesión escrita constituyen factores esenciales para apreciar si se prolongó hasta San Antón el estado de coacción o si el acusado ya había recobrado su libertad mental en San Antón. Por eso hemos creído necesario subrayar aquí que *el tipo* de coacción que vició la primera confesión escrita fue única y exclusivamente sicológico y que no mediaron amenazas, promesas u ofrecimientos, ni miedo o temor de clase alguna por parte del acusado de sufrimientos físicos o tan siquiera de incomodidades que pudieran recaer sobre él o sobre otras personas. Consideremos ahora cuál fue el *grado* de coacción sicológica que produjo la primera confesión escrita seis horas antes de la segunda con-

fesión oral en San Antón. La detención e incomunicación ilegal durante tres días y la naturaleza y forma del interrogatorio durante seis horas por la noche fueron los factores que en combinación rebasaron el *"Plimsoll Line"* del debido proceso de ley en cuanto a la primera confesión escrita. *Fikes* v. *Alabama*, 352 U.S. 191, 199 (1957). Véase Field, *Frankfurter, J., Concurring*, 71 Harv.L.Rev. 77–81 (1957). Pero a nuestro juicio no la rebasaron por mucho, es decir, el exceso de presión que constituyó coacción sicológica antes de las 6 de la mañana del día 10 de octubre fue relativamente leve para un hombre de la edad, carácter, experiencia, inteligencia y educación del acusado. El efecto de la detención e incomunicación prolongada durante tres días fue aminorado por el trato excelente que recibió el acusado mientras estuvo bajo el control exclusivo del fiscal y de la policía. Nótese que un periodista y un primo segundo del acusado pudieron verlo y hablar con él en ese período. Además el acusado nunca pidió ver a un familiar o a un abogado mientras estuvo detenido y ningún familiar o abogado suyo pidió verlo a él durante ese tiempo. La naturaleza y forma del interrogatorio excedió los límites de lo que es justo y razonable al amparo del concepto de "voluntariedad" que se aplica a las confesiones bajo el debido proceso de ley. En nuestra anterior opinión ya condenamos enérgicamente esta conducta del fiscal. Pero al considerar la voluntariedad no de la primera sino de la segunda confesión oral que hizo Fournier seis horas después en San Antón, no podemos olvidar que " . . . el interrogatorio no es inherentemente coercitivo, como lo es la violencia física". *Stein* v. *New York*, 346 U.S. 156, 184 (1953). Además el acusado fue interrogado por una sola persona, el fiscal Viera Martínez, quien estaba cansado pues había estado trabajando intensamente durante los tres días anteriores. No se trata pues de una situación como la de *Leyra* v. *Denno*, 347 U.S. 556 (1954) en que la primera confesión del acusado le fue arrancada mediante una sumisión, casi por trance, a las artes de un

siquiatra de gran destreza. Leyra fue virtualmente hipno-
tizado por el siquiatra e inducido por éste a hacer una con-
fesión a base de promesas de clemencia. Poco tiempo des-
pués en rápida sucesión hizo una serie de confesiones: una
al capitán de la policía, otra a su socio en un negocio y
otra a los fiscales. Sólo transcurrieron cinco horas desde el
momento en que comenzó el interrogatorio del siquiatra hasta
que Leyra hizo la última de las tres confesiones. Por eso
la Corte Suprema resolvió en ese caso que todas las confe-
siones eran "partes de un proceso continuo" y que todas eran
involuntarias. Claro está, la situación en el caso de autos
es totalmente distinta. A idéntica conclusión llegamos al
considerar el carácter de la segunda confesión oral de San
Antón en la primera apelación de este caso. *Pueblo* v. *Four-
nier*, supra, 281–87.

5. Seis horas después de la primera confesión involun-
taria el acusado hizo la confesión oral en San Antón. Ya
hemos visto que durante ese período el acusado no durmió
porque no quiso. Sin embargo, descansó, tomó café y se
lavó la cara. En el viaje a San Antón que duró media hora
el acusado no iba esposado. Al llegar allí no se encontró
solo con el fiscal y la policía. Siempre estuvo rodeado por
numerosos periodistas y fotógrafos de prensa mientras hacía
su confesión oral, describiendo en detalle, con palabras y
gestos, lo que pasó desde que estranguló a Iris Nereida, sobre
la bañera con el cinturón y el clavo que recogió del piso de
la casa, hasta que metió el cadáver en el baúl de su auto-
móvil. Las declaraciones de los testigos presenciales per-
miten revivir la atmósfera precisa y el tono sicológico exacto
de esa reunión en San Antón donde el acusado confesó oral-
mente por segunda vez. El acusado hablaba en voz apacible
y tranquila. Recibía un trato amable y cortés del fiscal, de
los detectives, de los reporteros y de los fotógrafos. Él tam-
bién se conducía en forma amistosa y amable con ellos.
Caminaba libremente de un lado a otro por toda la casa,
contestando espontáneamente las preguntas que le hacían los

reporteros y posando voluntariamente cada vez que los fotógrafos de prensa deseaban retratarlo en las distintas etapas de su confesión. Nadie allí lo presionó para que confesara. Nadie lo molestó, lo obligó o lo coaccionó. Hablaba libremente con los periodistas, con los fotógrafos y con el fiscal. Estaba sereno, contento, tranquilo y afable. No demostró en ningún momento estar nervioso y en las fotografías que allí se tomaron su rostro no denota cansancio, ni angustia, ni pesar. Aparece en esas fotografías describiendo con despreocupación todos los incidentes del crimen. No esconde su mirada, sino que se vira y mira directamente hacia el fotógrafo en muchas de ellas. Aun a través de las gafas ahumadas que tenía puestas, al acusado se le nota una mirada alerta y lúcida. Al terminar su confesión oral a las 12:30 p.m. regresó de San Antón a San Juan en un automóvil con el fiscal y el periodista Ramírez Brau. En el camino se detuvieron en Isla Verde a tomar cocos de agua y el acusado se tomó uno. Al llegar a las oficinas del fiscal en San Juan el acusado pidió ver a uno de sus familiares porque quería decir que él había confesado. Escogió ver a su tía Sara Sampedro para no intranquilizar a su madre y se entrevistó con ella. También se entrevistó allí en esos momentos con el Lic. Gaztambide Arrillaga. Aunque el acusado nunca estuvo fuera de la custodia de las autoridades entre la primera y la segunda confesión, en San Antón se encontraba en un ambiente totalmente distinto del que existía en las oficinas del fiscal antes de las 6 a.m. del día 10 de octubre cuando confesó bajo presión sicológica. Habían transcurrido ya seis horas. No estaba solo frente al fiscal y sí en presencia de seis periodistas y tres fotógrafos de prensa. Tenía absoluta libertad de movimientos y hablaba libre y espontáneamente con éstos. Y en el sitio donde se encontraba no existía una atmósfera hostil contra él. La situación sicológica total era, pues, mucho más favorable para Fournier que la que rodeó al acusado en *Lyons* v. *Oklahoma*, 322 U.S. 596 (1944) cuando éste hizo su segunda confesión.

Sin embargo en el caso de *Lyons* la Corte Suprema de los Estados Unidos resolvió que la segunda confesión era voluntaria, a pesar de que el acusado había hecho una primera confesión bajo coacción sicológica.

Por las razones antes expuestas, estamos convencidos de que la confesión oral de Fournier en San Antón fue voluntaria. La declaración fue hecha cuando el acusado había readquirido su libertad mental para confesar o negar su participación en el crimen. Fuera de duda razonable se habían disipado ya las influencias coercitivas que produjeron la primera confesión escrita. La confesión de Fournier en San Antón constituyó la declaración voluntaria de una conciencia culpable. Fue "voluntaria" en el único sentido que ese término puede tener cuando se aplica a una confesión hecha por una persona arrestada y sospechada que se ve confrontada con prueba de culpabilidad que no puede negar ni explicar. *Cf. Thomas* v. *Arizona*, 26 U.S.L.W. 4312 (1958) y *Stein* v. *New York*, 346 U.S. 156 (1953). Véanse además *Commonwealth* v. *Makarewicz*, 132 N.E.2d 294 (Mass., 1956) y *Burwell* v. *Teets*, 245 F.2d 154 (C.A. 9, 1957), certiorari denegado en 355 U.S. 896 (1957).

## VI

En el décimocuarto y último señalamiento se alega que "el tribunal *a quo* cometió error al denegar la moción de nuevo juicio y dictar sentencia en contra del acusado (1) porque al acusado se le privó del derecho a un juicio imparcial y justo y del debido proceso de ley; (2) porque el veredicto no está sostenido por la prueba y es contrario a derecho". En su moción de nuevo juicio el apelante se basó en los mismos errores que se señalan aquí contra la sentencia apelada. Basta decir que por carecer de fundamentos ya hemos rechazado dichos errores. Véase *Pueblo* v. *Tilo*, 67 D.P.R. 496, 503 (1947). El veredicto está sostenido por la prueba y no es contrario a derecho. A nuestro juicio hay prueba robusta de carácter circunstancial que

permitía al jurado rendir un veredicto por asesinato en primer grado. Véanse *Pueblo* v. *Rosario*, 67 D.P.R. 371, 375–376 (1947); *Pueblo* v. *Rivera*, 70 D.P.R. 570, 574 (1949); Perkins *Criminal Law*, 1957, 71–78. Además el acusado recibió un juicio justo e imparcial que se ajusta a todos los requisitos del debido proceso de ley. Así lo demuestra a saciedad el récord que tenemos ante nos y la discusión que acabamos de hacer de todos los errores por él señalados.

Deben confirmarse la sentencia apelada y la denegatoria de un nuevo juicio.

El Juez Asociado Sr. Pérez Pimentel no intervino.

---

APÉNDICE

El interrogatorio a que fue sometido el acusado por el fiscal en la noche del 9 al 10 de octubre (Exhibit 43 de El Pueblo) duró seis horas. En el récord ocupa 147 páginas (T.E., 7ma. pieza, págs. 49–196). Copiamos a continuación parte de las preguntas y contestaciones que aparecen en la última tercera parte de ese interrogatorio donde aparece claramente que el acusado siempre estuvo muy consciente de sus derechos legales. En las primeras dos terceras partes el fiscal y el acusado habían sostenido un extenso diálogo sobre asuntos que en verdad eran totalmente irrelevantes a los hechos que se le imputaban a Fournier.

"P. ¿No podía preguntar? R. A usted le está mal la sonrisa de la cara mía y yo he estado haciendo un análisis completo del licenciado Ángel Viera Martínez actuando en una manera y actuando como fiscal en otra y he estudiado su carácter y lo que me está es la facilidad con que cambia de una implicación con malicia a una implicación de sinceridad y de explicación. Lo he estado estudiando bajo ese punto de vista. La sonrisa mía para con el fiscal Viera; como Fiscal está bajo la impresión de que yo lo que estoy es relajando o burlándome de la manera de ser de él y yo no me estoy burlando. Estoy estudiando esa impresión, muchas veces que me pongo serio y cuando dice algo en ese tono, con el énfasis ése como que esa nerviosidad lo revienta por dentro. . . . P. ¿Está nervioso

ahora o no está? R. No. P. Entonces cuando usted manda a cualquiera para el infierno, ¿qué más le hace, además de mandarlo para el infierno, le acomete? R. No. P. ¿Pero además de mandar a uno para el infierno? R. No sé que podría contestar en este sentido; que usted puede llegar al punto de violentarme para que yo lo acometa y no lo acometería en ningún momento. P. Le voy a preguntar lo siguiente: ¿Por qué, o a qué conclusión llega usted de aparecer en esa fosa en el fondo de una fosa un hoyo hecho más abajo y puesto encima un piso de concreto el cadáver de una mujer que no era la esposa de Gregorio Fargas; que no era la esposa de Ernesto Santana, que no era la esposa de Agapito Rosa, que no era la esposa de Juan Ponce, ni la esposa de Pedro Andino sino la suya, estrangulada y enterrada allí en el Cementerio Fournier del que usted es condueño, donde usted manda, donde usted se mete, donde usted tiene autoridad? R. Ese es el punto que se puede esclarecer completamente por la investigación. P. ¿La contestación la dio de que fue usted quien la estranguló y la enterró allí? R. Esa es su deducción. P. Esa es la deducción suya. R. Mía no. P. ¿Quién usted cree que fue, vamos a ver? R. Como le dije antes si lo supiera se lo hubiera dicho. P. ¿De quién sospecha usted? R. No. P. ¿Lo vio el cadáver? R. Sí lo ví, un cadáver en la tumba que dijeron era de ella. Usted mismo me lo dijo. P. ¿Usted la reconoció bien a ella? R. Bueno, enseñándome el cuerpo puedo decirle. . . . P. ¿Por qué razón aparece como tapada la boca de Iris Nereida con un pañuelo? R. No puedo decirle. P. ¿Y aparece con un cinturón atado al cuello por usted? R. No, señor, P. Y se le ha atado un clavo. R. ¿Por qué tengo que ser yo? P. Porque no puede ser otro, sino usted, porque los muertos no caen a las tumbas, aparece con un cordón atado al cuello, con un cinturón, haberla llevado en el baúl del carro, haberle pedido las llaves a Juan Ponce. R. Ya me está haciendo insinuaciones directas. P. Lo estoy acusando a usted. R. Y yo con todos mis derechos si es que los tengo no estoy obligado a contestar esas preguntas. P. ¿Si usted cree que se perjudica no tiene derecho a contestar? R. No me perjudico pero me niego a contestar. P. ¿Por qué se niega a contestar? R. Porque es una acusación directa. P. ¿Por qué usted va donde Juan Ponce a buscar las llaves por la noche? R. Yo no tengo nada más. Ahora todas las preguntas suyas son acusaciones hacia mí. P. Le estoy preguntando. R. Yo no tengo nada más que con-

testar, si usted cree que tiene base para una acusación contra mí . . . P. ¿Usted se perjudica? R. No me perjudico. P. ¿Yo le pregunto si se incrimina? R. No me incrimino. P. Si no se perjudica en nada me va a contestar. R. Ahora no quiero contestar porque ya es una acusación directa. P. ¿No me va a contestar las preguntas? R. De ninguna especie. P. ¿En ninguna forma, ni invitándolo con alguna contestación? R. Depende de lo que quiera. P. ¿De qué otra cosa va a ser? R. Yo creo que ya esto es una acusación directa, lo que falta que me acuse directamente. P. Si usted no se incrimina en nada. R. Eso usted cree pero puede ser perjudicial para mí. P. Eso lo determina usted. R. Y usted. P. ¿Usted cree que es perjudicial? R. Yo no creo que es perjudicial. P. ¿Tiene en mente mandar al fiscal al infierno? R. Ahora está actuando como un fiscal. P. Yo le pregunto a usted, ¿por qué usted fue a buscar donde Juan Ponce la llave? R. No tengo que contestar nada más. P. ¿Porque se incrimina? R. No me incrimino. P. ¿Por qué usted mandó a Gregorio Fargas a hacer un hoyo? R. No tengo que contestar. Ahora guardaré silencio hasta las buenas noches. P. ¿Por qué hasta las buenas noches, porque se perjudica? R. Porque no voy a hablar nada más. P. Tiene que contestarme las preguntas una por una. R. Yo vine a contestar sus preguntas voluntariamente contrario a opiniones de abogados que siempre me han dicho todas las cosas y yo creo que tengo derecho a no contestar nada más. P. Usted va esa noche del 7 de septiembre de 1950 al cementerio suyo, contésteme. R. De ahora en adelante no tengo que contestar. P. ¿Le perjudica? R. No me perjudica en nada. P. ¿Ni se incrimina? R. No me incrimina. P. Tiene obligación de contestarme. R. No voy a contestar nada más. . . . Hon. Fiscal: No contesta porque es culpable del asesinato de Iris Nereida Hernández. No contesta porque estranguló a Iris Nereida. R. Usted es quien hace esa conclusión. P. ¿Usted estranguló a Iris Nereida Hernández? R. No señor. P. Su ex esposa. R. No señor. P. ¿Y la enterró en la forma que usted la vio? R. No señor. P. ¿ . . . creyendo que usted iba a hacer el crimen perfecto? R. Usted me ha dado a entender que el crimen perfecto no existe. P. ¿Contesta o no contesta? R. Contesto que no, que no es lo que usted dice. P. ¿Por qué usted mandó a abrir ese hoyo en la fosa número cuatro, más abajo del fondo, como de dos pies y medio, por qué? R. Porque usted dijo que para ver si salía agua. P. Eso

usted le dijo a Gregorio Fargas, que se enterró allí el cuerpo de Iris Nereida Hernández. R. Lo que le digo que no. . . . P. Usted sabía que allí había un cadáver. Mire a ver si era costumbre hacer un hoyo en el fondo de la fosa para ver, si salía agua en verdad, o es que usted es culpable del asesinato por estrangulación de Iris Nereida Hernández a quien enterró en una fosa de su propio cementerio y guarda silencio porque usted conoce el sitio y sabe que allí no salía agua. Le voy a traer el clavo que usted utilizó y me va a decir de dónde lo encontró. ¿Me lo va a decir? R. Yo no tengo nada más que decir. P.¿No tiene nada más que decir, por qué? R. Yo se lo he dicho todo. P. ¿Usted ha hablado todo? R. Yo lo he dejado. Tengo mis derechos de no contestar. . . ."

(Luego de cuatro o cinco preguntas adicionales, el fiscal terminó el interrogatorio porque el acusado se negó definitivamente a seguir contestando.)